**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Hector MARIN and Aida Serna Barreto, Defendants-Appellants.**

Nos. 83–3209, 83–3210.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1984.

Decided May 7, 1985.

As Amended May 15, 1985.

Steven A. Miller, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Jack I. Rodgon, Chicago, Ill., for defendants-appellants.

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

1. The Government refused to disclose the identity of the confidential source at the suppression

Before CUDAHY and COFFEY, Circuit Judges, and GRANT, Senior District Judge.*

COFFEY, Circuit Judge.

The defendants, Hector Marin and Aida Serna Barreto, appeal their convictions for conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846. We affirm.

I

On May 9, 1983, Maurice Dailey, an agent of the Federal Drug Enforcement Administration ("DEA"), met with a confidential source [1] who informed Dailey that an Aida Serna Barreto was distributing cocaine on the north side of Chicago, Illinois. Surveillance of Barreto began on May 16, 1983, after various background checks conducted by DEA agents disclosed that she resided at 2000 West Summerdale in Chicago. On May 16, DEA agents observed Barreto travel to O'Hare Airport, where she met a Latin male arriving on a flight from Florida, and on May 18, 1983, the confidential source informed the DEA that Barreto had just received a shipment of cocaine from Florida. On May 24, 1983, at approximately 7:30 a.m., the confidential source again contacted the DEA, this time informing the agents that Barreto would begin distributing cocaine that day. After receiving this information, Agent Dailey organized several DEA agents to conduct further surveillance of Barreto. Dailey provided the agents conducting the surveillance operation with all the information contained in the DEA files concerning Barreto.

Between 9:00 and 9:30 a.m. on May 24, 1983, the DEa agents observed Barreto leave her residence, enter a yellow Camaro automobile registered to Hector Marin, 901

hearing. Agent Dailey testified that the source who provided information concerning Barreto was primarily in contact with Agent Tom Bridges. Dailey's first contact with the source was when they met on May 9, 1983.

West Argyle, and drive two or three blocks south where she picked up two Latin passengers, one male and the other female. The agents observed Barreto and her two passengers proceed to 1507 West Lawrence in a circuitous manner, circling blocks and retracing their path several different times for approximately one-half hour, in an obvious effort to elude and frustrate attempted surveillance. Barreto exited the automobile, entered the building at 1507 West Lawrence, and after several minutes returned to the automobile. Barreto continued to drive in a circuitous manner, eventually returning to her residence at 2000 West Summerdale. Barreto exited the automobile and entered her residence, while the male and female Latin passengers drove off in the Camaro. At approximately 1:25 p.m., the agents observed Barreto leave the building at 2000 West Summerdale, unaccompanied, and enter a black Oldsmobile, registered to Isabella Scott. Barreto drove away in a circuitous manner, circling blocks, retracing streets, and proceeding very slowly, taking fifteen to twenty minutes to drive the ten to twelve blocks from her residence to 901 West Argyle.[2]

Upon Barreto's arrival at 901 West Argyle, a Latin male, later identified as Hector Marin, exited the building at that address, carrying a brown paper bag. Marin stood on the sidewalk, nervously and cautiously looking up and down the street for several minutes. He then ran to the black Oldsmobile and entered the driver's side of the vehicle, still carrying the brown paper bag. Barreto slid over to the passenger side as Marin bent over, his head disappearing from view for several seconds, and then reappeared behind the steering wheel. Marin and Barreto drove westbound approximately one block, turned onto Sheridan Road, and immediately pulled the vehicle to the curb where Marin surveyed the area, looking out of the driver's window

down Argyle Street. Marin soon merged into traffic and drove back and forth on side streets for ten to fifteen minutes, eventually entering southbound Lake Shore Drive, the entire time under the surveillance of the DEA agents.[3]

Marin and Barreto traveled south some twenty blocks, exited Lake Shore Drive, and proceeded west on Fullerton, where they quickly became mired in heavy traffic. Agent Dailey, afraid that Marin and Barreto would be lost in the heavy traffic, instructed Agents Knute Nyman and Lawrence Evans, who had been following Marin and Barreto since their entry onto Lake Shore Drive, to "stop the vehicle." Agent Evans approached the driver's door, announced that he was a police officer, instructed Marin to get out of the car, conducted a protective search of Marin, and directed Marin to produce a driver's license or other identification. Simultaneously, Agent Nyman approached the passenger door and yelled, "Police officer. Get out of the car." Nyman testified that as he approached the automobile, Barreto "bent over in the front seat and was doing something on the floor." Agent Nyman opened the door, grabbed Barreto by the arm, and pulled her from the car. Nyman looked on the floor of the automobile and saw the brown paper bag that Barreto appeared to be reaching for as he approached. Nyman opened the bag looking for weapons or narcotics and discovered a white substance that appeared to be cocaine. Barreto and Marin were placed under arrest and a field test of the white substance contained within the brown paper bag indicated that the substance was indeed cocaine.

Agent Dailey arrived on the scene, informed Marin and Barreto of their *Miranda* rights, asked Marin his address, and also asked him if anyone was at his residence. Marin responded that he lived at 901 West Argyle, and that his wife was

---

2. The DEA agents testified at the suppression hearing that a driver following a direct route could have traveled the distance between 2000 West Summerdale and 901 West Argyle in as little as five minutes.

3. DEA agents testified at the suppression hearing that a driver following a direct route from 901 West Argyle to southbound Lake Shore Drive normally could travel the distance in five minutes.

probably not at home, but might be at a laundromat near their apartment. Agent Evans proceeded to 901 West Argyle, and about one-and-a-half blocks away from that address, he stopped a woman and a young female child on the street. Agent Evans introduced himself as a police officer and asked the woman, whom he believed to be Mrs. Marin, to identify herself. Mrs. Marin, who was then four months pregnant, identified herself as Hector Marin's wife. While waiting for Agent Dailey, Evans explained to Mrs. Marin that her husband had been arrested for possession of cocaine. According to Evans, he told Mrs. Marin that he would "obtain a search warrant, if necessary to search the apartment" but asked "if she would give ... permission to search the apartment." Agent Evans further testified that, "[w]e told her that she in effect had the right not to consent to a search. At that point in time, she said we could search her apartment, but if we could put it in writing." Evans took no further action until Agent Dailey arrived.

When Dailey arrived, Evans, Mrs. Marin, and her daughter got out of the automobile in which they had been waiting. Dailey introduced himself and asked Mrs. Marin a second time if she would consent to a search of the Marin apartment. According to Agent Dailey, Mrs. Marin again consented to the search, but again stated that she "wanted [the consent] in writing." Dailey requested via radio that a Spanish translation of a consent to search form be delivered to the Marin apartment building,[4] and an officer arrived with the form in twenty to twenty-five minutes. Evans observed that after the Spanish consent form was handed to Mrs. Marin, "she read it before she signed it." Once Mrs. Marin had executed the consent form, DEA agents entered the Marin apartment and searched the premises, uncovering a scale and an attaché case that contained approximately $7,000 in cash and one kilogram of cocaine.

This evidence was presented to a Federal Grand Jury which returned an indictment against Barreto and Marin for conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine. Barreto and Marin pled not guilty and filed a motion to suppress the cocaine seized from the automobile in which Marin and Barreto were traveling for lack of probable cause, and the cocaine seized from Marin's apartment for lack of either a valid search warrant or valid consent. Following an evidentiary hearing, the district court denied the defendants' motion to suppress, holding that the totality of circumstances provided the agents with probable cause to stop and search the automobile. The district court further ruled that Mrs. Marin had consented to the search of the Marin apartment. Barreto and Marin waived a jury trial and following a one-day trial before the bench, the district court found the defendants guilty of conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846. The district court sentenced Barreto to five years imprisonment and Marin to a four year prison term. On appeal, the defendants contend that the district court erred in failing to suppress the cocaine seized from the automobile and the Marin apartment.

---

**4.** Agent Dailey testified at the suppression hearing that when an individual consenting to a search speaks Spanish, he always uses a Spanish consent form to prevent the individual from signing an English consent form, and later denying in court that he or she was able to understand the consent form. The record reveals that Mrs. Marin was born in Equador, had resided in the United States nine years at the time of trial, and, *according to her testimony at the suppression hearing, did not speak English*. The following exchange took place at the suppression hearing between the defense counsel and Agent Dailey concerning Mrs. Marin's ability to understand English:

"Mr. Rogdon: And she spoke very little English?

Agent Dailey: No. She spoke broken English, but English.

Rogdon: Well, did she understand you?

Dailey: Yes.

Rogdon: She knew what you wanted?

Dailey: Yes. She knew that—everything I told her about, she understood and acknowledged by 'yes.'"

II

## A. THE SEARCH OF THE AUTOMOBILE

The defendants initially contend that the DEA agents lacked probable cause to stop and search the black Oldsmobile in which they were traveling. The defendants argue that the two-prong test of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)—which considers the basis of an informant's knowledge and the informant's veracity or reliability—must guide this court's analysis of the probable cause issue. According to the defendants, the DEA agents' confidential source, who provided the agents with information concerning Barreto's participation in cocaine traffic, had no prior history as an informant, no credibility, no veracity, and provided no detail or basis for the substance of his information. Moreover, the defendants contend that the surveillance by the DEA agents revealed, at best, only innocuous, legal activity. The defendants claim, therefore, that under the totality of the circumstances test, the agents possessed insufficient knowledge to establish probable cause for the stop and search of the automobile.

■ We note at the outset that the DEA agents did not have a valid warrant in their possession when they stopped and searched the black Oldsmobile. However, a warrantless search of an automobile is permissible under the Fourth Amendment when a law enforcement officer has "probable cause for believing that the automobile which he stops and seizes [contains] contraband...." *Carroll v. United States*, 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925). *See also United States v. Ross*, 456 U.S. 798, 808, 102 S.Ct. 2157, 2164, 72 L.Ed.2d 572 (1982); *Robbins v. California*, 453 U.S. 420, 424, 101 S.Ct. 2841, 2844, 69 L.Ed.2d 744 (1981); *Arkansas v. Sanders*, 442 U.S. 753, 760, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979); *United States v. Chadwick*, 433 U.S. 1, 12–13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977); *Chambers v. Maro-*

*ney*, 399 U.S. 42, 51–52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970); *Brinegar v. United States*, 338 U.S. 160, 176–77, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949); *United States v. Garza-Hernandez*, 623 F.2d 496, 500 (7th Cir.1980). In *Carroll*, the Court recognized a difference, for purposes of the warrant requirement of the Fourth Amendment, between the search of "a store, dwelling, house or other structure" and the search of an "automobile ... where it is not practicable to secure a warrant because the vehicle can quickly be moved out of the locality or jurisdiction in which the warrant must be sought." 267 U.S. at 153, 45 S.Ct. at 285. Thus, "[g]iven the nature of an automobile in transit ... a warrantless search of an automobile is not unreasonable." *Ross*, 456 U.S. at 806–07, 102 S.Ct. at 2163.

■ In *Ross*, the Supreme Court reaffirmed and clarified the automobile exception to the warrant requirement, holding that "the scope of the warrantless search authorized by [*Carroll*] is no broader and no narrower than a magistrate could legitimately authorize by warrant." 456 U.S. at 825, 102 S.Ct. at 2172. Thus, under the automobile exception to the warrant requirement, if a law enforcement officer has probable cause to believe an automobile contains contraband, the officer may conduct a search as though he had a warrant. The relevant case law clearly establishes that probable cause is a flexible, practical, common-sense standard that requires facts sufficient " 'to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar*, 338 U.S. at 175–76, 69 S.Ct. at 1311 (quoting *Carroll*, 267 U.S. at 162, 45 S.Ct. at 288). *See also Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983); *Dunaway v. New York*, 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979); *Garza-Hernandez*, 623 F.2d at 499. Probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily or even usefully, reduced to a neat set of legal rules."

*Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). Thus, "[i]n dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act." *Brinegar,* 338 U.S. at 175, 69 S.Ct. at 1310. *See also Gates,* 462 U.S. at 231, 103 S.Ct. at 2328; *United States v. Covelli,* 738 F.2d 847, 853 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984) (quoting *United States v. Watson,* 587 F.2d 365, 368 (7th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979)). Accordingly, the relevant inquiry in the case before us is whether, based on the information known to DEA agents at the time Marin and Barreto were stopped on Fullerton Avenue, the agents had a reasonable belief that the black Oldsmobile in which Marin and Barreto were traveling contained contraband.

◼ In our analysis of the probable cause issue, we must bear in mind that the actions of the DEA agents from May 16 through May 24 were based in part upon information received from a confidential source. The defendants argue that the confidential source in the instant case fails to satisfy either prong of the *Aguilar-Spinelli* analysis for evaluating probable cause based partially upon an informant's tip. The defendants' emphasis on the *Aguilar-Spinelli* test ignores the Supreme Court's decision in *Gates,* "to abandon the 'two-prong test' established by ... *Aguilar* and *Spinelli.*" 462 U.S. at 238, 103 S.Ct. at 2332. *Gates* has thus replaced *Aguilar* and *Spinelli* as providing the framework for analyzing probable cause based in part on information from a confidential source. In place of the *Aguilar-Spinelli* analysis, the recent *Gates* decision reaffirms the totality of circumstances analysis that traditionally has governed probable cause determinations. According to the Supreme Court in *Gates,* the task of determining the existence of probable cause "is simply to make a practical, common-sense decision, whether given all the circumstances ...

there is a fair probability that contraband ... will be found in a particular place." 462 U.S. at 238, 103 S.Ct. at 2332. Indeed, in *Massachusetts v. Upton,* —— U.S. ——, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (per curiam), another case in which a finding of probable cause was based partially upon information from a confidential source, the Supreme Court affirmed the *Gates* totality of the circumstances approach, again rejecting the judging of "bits and pieces of information in isolation against the artificial standard provided by the two-pronged test." 104 S.Ct. at 2088. In *Upton,* the Court reasoned that no single piece of evidence need be conclusive; rather, probable cause exists when "the pieces fit neatly together and, so viewed, support [a] determination that there [is] a 'fair probability that contraband or evidence of crime' would be found" in a certain location. *Id.* (quoting *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332). Although both *Gates* and *Upton* involved determinations of probable cause for the issuance of a warrant, "[t]his determination of probable cause ... is applicable to both warrant and warrantless searches." *United States v. Mendoza,* 722 F.2d 96, 100 n. 5 (5th Cir.1983) (citing *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959)).

◼ With these principles in mind, we analyze the facts known to the DEA agents when they stopped and searched the black Oldsmobile in which Barreto and Marin were traveling. Both Agents Dailey and Bridges had personal contact with the confidential source who first informed the DEA that Barreto was dealing cocaine. Although the source had never provided information prior to the May 9 conversation with Dailey, the informant provided information about Barreto on three separate occasions, and on each occasion, the informant provided more detailed information concerning Barreto's cocaine dealings. On May 9, the tip was that Barreto was dealing cocaine; on May 18, the informant advised the DEA agents that Barreto had just received a shipment of cocaine; and on May 24, the DEA agents were told that

Barreto would commence cocaine sales that day. Furthermore, Agent Dailey testified at the suppression hearing that between the first contact with the confidential source on May 9, and the third tip concerning Barreto on May 24, the informant had also provided "[o]ther information he had received, and it was verified."

However, it must be made clear that the DEA agents did not search the black Oldsmobile solely on the basis of the confidential source's information alone. Rather, the agents conducted surveillance of the defendants which independently corroborated the source's information that Barreto was engaged in illicit, drug-related conduct. On May 16, the agents observed Barreto meet a Latin male arriving at O'Hare Airport on a flight from Florida, a known source state for the illegal traffic of cocaine in Chicago. On May 24, the agents observed Barreto driving two different automobiles, neither of which was registered in her name. The DEA agents observed Barreto drive circuitously to 901 West Argyle, where Marin resided, observed Marin exit that building carrying a brown paper bag and act cautiously before entering the vehicle with Barreto, and then observed Marin drive circuitously, in an obvious effort to elude and frustrate attempted surveillance. These actions, when considered not in isolation, but in the context of the totality of the circumstances known to the DEA agents, warrant a well-trained law enforcement officer, exercising reasonable judgment, to believe that a narcotics crime was being committed. "[T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Gates*, 462 U.S. at 244 n. 13, 103 S.Ct. at 2335 n. 13. *See also Mendoza*, 722 F.2d at 101. Moreover, when observing activity of a person suspected of criminal activity, Government agents are entitled to reasonably rely upon their special knowledge and expertise to assess probabilities and draw inferences. *United States v. Carlson*, 697 F.2d 231, 238 (8th Cir.1983); *United States v. Flynn*, 664 F.2d 1296, 1304 (5th Cir.), *cert. denied*,

456 U.S. 930, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982); *Garza-Hernandez*, 623 F.2d at 499; *cf. United States v. Prim*, 698 F.2d 972, 975 (9th Cir.1983) (existence of probable cause is an objective standard applied to the "perceived belief of the law enforcement officer").

In *Mendoza*, the Fifth Circuit applied these general principles to facts similar to the facts of the instant case. In *Mendoza*, DEA agents received information from an anonymous source that a specific individual "would be moving a large shipment of cocaine 'during the [Labor Day weekend]' from the New Orleans area to Miami." 722 F.2d at 97. Local police narcotics agents conducted surveillance that revealed the following activity on the part of the specified individual over a two-day period during the Labor Day weekend: (1) driving in a manner calculated to elude surveillance; (2) using pay telephones; (3) inspecting the undercarriage of his automobile; (4) going to a hotel room that had been registered to a man with a Florida address; and (5) other suspicious activity. *Id.* at 101. In *Mendoza*, the court concluded that although no one item of the Government's evidence considered in isolation would support a finding of probable cause,

> "to experienced narcotics agents familiar with the methods employed by drug traffickers, the totality of the circumstances, including the informant's tip, did establish probable cause to believe that Mendoza's car was being used to transport seizeable contraband. The events [observed during surveillance], otherwise consistent with innocent behavior, had combined with the tip to reach a point where a reasonable and cautious man could believe that a criminal course of conduct was substantially more likely than an innocent one."

*Id.* at 102.

In the instant case, as in *Mendoza*, no single item of Government evidence, viewed in isolation, would support a finding of probable cause. Yet, as in *Mendoza*, the DEA agents observing Barreto and Marin were justified in drawing upon their experi-

ence to determine that the actions they observed, together with the information provided by a known confidential source, provided "a fair probability that contraband or evidence of a crime [would] be found" in the black Oldsmobile. *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. Accordingly, we hold that the stop of the Oldsmobile in which Barreto and Marin were traveling and the warrantless search of that same automobile were permissible under the Fourth Amendment.

## B. THE SEARCH OF THE MARIN APARTMENT

The defendants next argue that Mrs. Marin's consent to the search of the Marin apartment was not voluntary, but rather that DEA agents coerced Mrs. Marin into consenting to a search by threatening and frightening her. Further, the defendants contend that Mrs. Marin did not, and could not, understand the Spanish consent form that she signed. The district court, however, found that Mrs. Marin's testimony concerning her consent was not credible and thus found her consent to be valid. "In reviewing the lower court's findings of fact, the appellate court does not consider the credibility of the witnesses or the weight that should be given to their testimony. That is the province of the trial court." *In re Lemmons & Co.*, 742 F.2d 1064, 1070 (7th Cir.1984). Accordingly, the district court's finding on the issue of consent will not be disturbed by this court unless clearly erroneous. *United States v. Sanchez-Jaramillo*, 637 F.2d 1094, 1098 (7th Cir.), *cert. denied*, 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 79 (1980).

It is "well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). *See also United States v. Glasby*, 576 F.2d 734, 737 (7th Cir.), *cert. denied*, 439 U.S. 854, 99 S.Ct. 164, 58 L.Ed.2d 159 (1978). When the prosecution relies on consent as a justifica-

tion for a search, the prosecution has the burden of establishing that the consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968); *Glasby*, 576 F.2d at 737. Whether or not the consent given was voluntary "is a question of fact to be determined from the totality of all the circumstances." *Bustamonte*, 412 U.S. at 227, 93 S.Ct. at 2047. *See also United States v. Morgan*, 725 F.2d 56, 58 (7th Cir.1984). The prosecution is not, however, "limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over ... the premises sought ... to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). In the case before us, it is not questioned that Mrs. Marin had "common authority" over the Marin apartment with her husband, and thus Mrs. Marin had authority to consent to a search of the Marin apartment. *See United States v. Harrison*, 679 F.2d 942, 947 (D.C.Cir.1982); *United States v. Stone*, 471 F.2d 170, 173 (7th Cir.1972), *cert. denied*, 411 U.S. 931, 93 S.Ct. 1898, 36 L.Ed.2d 391 (1973).

Witnesses at the suppression hearing presented conflicting testimony concerning the circumstances surrounding Mrs. Marin's consent to search the apartment. Mrs. Marin testified through an interpreter that DEA Agent Evans took away her keys and threatened to take away her daughter unless she gave her consent to a search of the apartment. Agents Evans and Dailey testified to the contrary, that no threats of any kind were made against Mrs. Marin, and that to their knowledge, no one had taken Mrs. Marin's keys away from her. Agents Evans and Dailey further testified that on two separate occasions Mrs. Marin orally agreed to give permission for them to search the Marin apartment. Because Mrs. Marin wanted the consent in writing, and because Dailey wanted Mrs. Marin to sign a Spanish consent form, the agents delayed

searching the apartment approximately twenty-five minutes until they were able to obtain a consent form printed in Spanish that explained Mrs. Marin's right not to consent. The consent form, as translated by the interpreter at the suppression hearing,[5] did not translate perfectly into English. Although certain nuances of the original may be lost, it is possible to translate between Spanish and English; we agree with the district court that the Spanish translation adequately communicated the concepts that Mrs. Marin could refuse to give her consent if she so desired, that she could require a warrant before a search of the premises, that she could consult with any person before giving her consent, and that her consent was gained without promises or threats. It may be true, as the defendants argue, that the presence of the DEA agents, the knowledge of her husband's arrest, and the request to search the apartment upset Mrs. Marin. Nevertheless, absent coercion, the voluntariness of Mrs. Marin's consent is not overcome by the fact that she may have been upset, *Stone*, 471 F.2d at 173, or by the fact that she was told a warrant would be obtained if she refused to consent, *United States v. Slupe*, 692 F.2d 1183, 1188 (8th Cir.1982).

After hearing the witnesses' testimony and observing the witnesses' demeanor, the district court "[did] not find it credible that a woman who has been in the country for nine years indicates that she does not read and understand English." The district court also noted that Mrs. Marin's right not to consent was explained to her in English by the DEA agents on two separate occasions and a third time in a Spanish consent form that she read and signed. Since the

Government presented more than ample evidence at the suppression hearing to support the district court's finding that Mrs. Marin's consent was knowingly and voluntarily given, the district court's denial of the defendants' motion to suppress the cocaine seized at the Marin apartment was not clearly erroneous, and thus is affirmed.

### III

The decision of the district court is AFFIRMED.

---

5. "Permit to examine, me, Norma Marin, comprehending my—or understanding my rights, my constitutional rights, first, and that I can—I can ask for an authorization of examine—that I can ask that an authorization of examiner—it's—how you say, in Spanish? They have to obtain before they make the exam.

Second, that I have—I can negate permit to examine.

Third, that anything that they find, that it is matter of search, they can pick it up and use it against me in a criminal prosecution.

Four, that I can revoke the permit of examining in any time, and fifth, that I can consult with any person of my preference before doing the decision of announcing my rights giving permission to this examination.

I authorize ... agents of Drug Enforcement Administration, to conduct ... the examination complete of the apartment under my control, apartment 61. This permission, written permission, is given under my will, without—without any—without promises or—... threats."