**UNITED STATES of America, Plaintiff,**

v.

**Gabriel MONTOYA and Maria Munoz, Defendants.**

**Crim. A. No. 86–06–JJF.**

United States District Court,
D. Delaware.

March 21, 1986.

Charlene D. Davis, Asst. U.S. Atty., Wilmington, Del., for plaintiff.

J. Michael Johnson, of Biggs & Battaglia, Wilmington, Del., for defendant Montoya.

Olha N.M. Rybakoff, of Connolly, Bove, Lodge & Hutz, Wilmington, Del., for defendant Munoz.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FARNAN, District Judge.

This matter comes before the Court on defendant Gabriel Montoya's ("Montoya") Motion to Suppress the fruits of a warrantless automobile search, pre-arrest statements and post-arrest audiotaped statements. On January 14, 1986, Montoya and Maria Munoz ("Munoz") were each charged in a two-count indictment with one count of conspiracy to possess, with intent to distribute, cocaine (21 U.S.C. § 846) and possession with intent to distribute cocaine (21 U.S.C. § 841(a)). These charges stem from an incident on January 10, 1986, on Interstate 95 ("I–95"), during which approximately 41 pounds of cocaine were seized and Montoya and Munoz were arrested. Pursuant to the Motion, a suppression hearing was held on March 7, 1986, at which two government witnesses and Montoya testified.[1] For the reasons set forth below in the Court's Findings of Fact and Conclusions of Law, Montoya's motion is denied with respect to the warrantless search and pre-arrest statements, and granted with respect to the post-arrest taped statements.

## FINDINGS OF FACT

On January 10, 1986, Trooper William Rhoades of the Delaware State Police was on duty and serving with the Turnpike Patrol Traffic Unit. At approximately 9:00 a.m., Trooper Rhoades was driving an unmarked State Police vehicle northbound on I–95 approaching Route 7 in New Castle County, Delaware. (Transcript of March 7, 1986 ["Tr."] at 6.) While traveling in the left hand lane at a speed of 55–60 mph, Trooper Rhoades observed another car approaching his car in his rearview mirror. (Tr. at 6–7.) The vehicle behind Trooper Rhoades' suddenly switched from the left lane to the center lane and passed his automobile. (Tr. at 7.) To determine the vehicle's speed, Trooper Rhoades accelerated to obtain a clock with the vehicle, using both radar and the reading on his speedometer. (Tr. at 7–8.) After obtaining two simultaneous readings of 75 mph, Rhoades turned on his high beams and red grille

---

1. Munoz originally joined in Montoya's Motion to Suppress and participated in this Court's suppression hearing. However, ten days after the suppression hearing, the government dismissed both counts of the indictment against Munoz, who was a passenger in the car driven by Montoya.

lights, and activated his siren. (Tr. at 8.) Since the left hand shoulder of I–95 was wider, and therefore somewhat safer, Rhoades directed the driver of what he now observed to be a tan station wagon to pull over to the left shoulder. (Tr. at 9.)

Immediately after both automobiles came to a stop, both Trooper Rhoades and the driver departed from their vehicles, meeting near the rear of the driver's vehicle. Rhoades noted that the tan station wagon was fairly new and had wood-grained panels on the outside, and contained a New Jersey license plate number 701 ZIC. (Tr. at 10.) Pursuant to the standard request by Rhoades, the driver produced a New York State driver's license issued to Gabriel Montoya, 14603 Beech Avenue, Flushing, New York, bearing the date of birth 2/20/45. (Tr. at 10–11.) However, Montoya did not produce the vehicle's registration, stating that the vehicle was not his but that he knew the registration was valid. (Tr. at 12–13.)

Rhoades then returned to his unmarked State Police car and submitted a National Crime Information Center inquiry regarding the driver's license and New Jersey license plate. A few minutes later, Rhoades was advised that Montoya's New York license was valid and that he was not wanted in connection with any crimes. (Tr. at 13.) Rhoades then proceeded to question Montoya regarding the station wagon's ownership and Montoya's destination. Montoya responded that he was heading to New York and that the station wagon belonged to a woman customer or client. (Tr.

at 14.) Montoya told Rhoades that the station wagon broke down around Columbus or Columbia[2] and that he flew from New York at the woman's request to fix a broken carburetor on the wagon. (Tr. at 14–15.) Montoya further stated that he was driving the wagon back to New York for the woman customer in return for a $500 payment. (Tr. at 15.) Montoya, in response to another Rhoades' inquiry, stated that the woman customer had paid for his air fare to pick up the car.[3] (Id.)

When Trooper Rhoades initially met Montoya near the rear of Montoya's vehicle, Rhoades noticed a female passenger wrapped in blankets laying across the back portion of the station wagon. (Tr. at 16.) After questioning Montoya regarding the missing registration and circumstances surrounding his trip, Rhoades inquired about the identity of the female passenger. Montoya responded that the woman was his wife and was laying down because she was not feeling well. (Id.) Before approaching the female passenger, Rhoades, in a common precautionary procedure, patted down Montoya before opening the station wagon door where the woman was resting. (Id.) Rhoades then unsuccessfully attempted to converse with the woman, who apparently did not speak English. (Tr. at 16–17.)

In the course of the resumed conversation with Montoya, Rhoades noted that he failed to make eye contact and was dry-mouthed; Rhoades concluded these were signs of nervousness. (Tr. at 18.) Because Rhoades' suspicion was aroused, he asked Montoya for consent to search the station

**2.** The testimony at the hearing was contradictory with respect to the defendant's purported point of origination for his trip. Trooper Rhoades testified that Montoya stated he was from Columbus, whereas Montoya testified that he told Rhoades that he was from Columbia. *Compare* Tr. at 14 *with* Tr. at 112.

**3.** Trooper Rhoades testified that in addition to other salient factors, the colloquy that took place between Rhoades and Montoya regarding the state wherein Columbia or Columbus is situated aroused Rhoades' suspicion in Montoya. Initially, Rhoades asked Montoya if he was coming from Columbia or Columbus, Maryland, and Montoya replied affirmatively. (Tr. at 14.)

During a subsequent interchange, Rhoades asked Montoya if he was coming from Columbia or Columbus, South Carolina, and Montoya also responded affirmatively. (Tr. at 17.) Although this contradiction aroused suspiciousness in Rhoades (Tr. at 60–62), the Court places little weight on this colloquy because Rhoades acknowledged that Montoya had a predisposed propensity to repeat the last thing said in a question directed to him. Moreover, Rhoades admitted that the traffic on I–95 diminished the ability to converse because of the noise. Montoya could have also been responding affirmatively to the part of the question that mentioned Colombia, which is the country he is from.

wagon. Montoya replied, "you want to search the car?", and, motioning to the station wagon, Montoya further stated, "you go ahead, you search the car." (Tr. at 18–19.)

Next, Rhoades returned to his unmarked State Police car and called for back-up assistance, specifically for Trooper Howard Mozer. (Tr. at 19–20.) While awaiting the back-up, Montoya remained outside his vehicle, neither physically nor verbally restrained. (Tr. at 19–21.) When Mozer arrived, both police officers approached Montoya's vehicle, with Mozer searching the front part of the vehicle. Rhoades then began to search the back part of the vehicle, first opening the rear door and then searching the baggage situated in the back part of the station wagon. (Tr. at 21–22.) Rhoades lifted up a large section of carpet that covered the back part of the station wagon, and observed a solid plate covering the entire back of the vehicle. (Tr. at 22.) The metal plate was screwed to the floor bed of the station wagon. (Tr. at 27.)

Before proceeding further with the search, the officers decided that, although Rhoades had earlier obtained an unequivocal oral consent, they would attempt to obtain Montoya's written consent to search the vehicle. (Tr. at 22.) Montoya accompanied Rhoades back to Rhoades' unmarked State Police car and Montoya sat unrestrained in the back seat. (Tr. at 23.) Rhoades advised Montoya that Montoya had already verbally consented to the search, but Rhoades was nonetheless asking Montoya for a written consent to continue searching the station wagon. (Tr. at 23.) In reply, Montoya stated that "I already told you it was okay," and he proceeded to sign a Delaware State Police standardized written consent form. (Tr. at 23–25.)

At approximately this point in time, Trooper Rhoades knelt down to inspect the underside of the station wagon and observed a compartment which appeared inaccessible. (Tr. at 24.) It was also approximately at this point in time when Corporal Owsiany of the Delaware State Police arrived at the scene and notified Rhoades that the license plates had expired and the station wagon's registration was therefore invalid. (Tr. at 26.)

Shortly after Montoya signed the written consent form, the officers recommenced the search by removing the sheetmetal screws holding the metal plate in place in the wagon. (Tr. at 27.) After sliding the plate out of the car, the officers cut open the packaging tape which sealed the compartment, removed two or more bolts, and then opened the compartment doors. (*Id.*) The officers observed wrapped packages within the compartment and decided to conduct a substance test on them. (Tr. at 28.) Rhoades performed the test by making a small incision in one of the packages, removing a small amount of the substance, and placing it in a Cobah thiazine test kit. (Tr. 28.)

After the field test proved positive for cocaine, Montoya and Munoz were arrested and orally advised of their *Miranda* rights. (Tr. at 29.) Both defendants were then transported to Troop 6 of the Delaware State Police, where they were processed while the station wagon was being searched and photographed. (Tr. at 30.) After the Drug Enforcement Administration was notified, Rhoades asked Montoya if he would be willing to cooperate with the authorities. (Tr. at 72–73.) Montoya said that he would be willing to cooperate if the officer would accompany him to New York, but Rhoades replied that he would be unable to do that. (Tr. at 113.)

Approximately two and one-half hours after the initial stop by Rhoades, Special Agents William Glanz and William Bouldin of the Drug Enforcement Administration and Trooper Rhoades interviewed Montoya in an interrogation room at Troop 6. (Tr. at 30.) The interview was recorded on an audiotape cassette player. Montoya was orally advised of his *Miranda* rights in English and, in response to Rhoades' question regarding Montoya's understanding of these rights responded, "Not too much. Can I read?" (Government Exhibit ["GX"] 4A at 1.) Rhoades then handed Montoya a

card on which each of his rights was written in both English and Spanish. (*Id.*)

Shortly after receiving the card, the following exchange occurred:

TROOPER RHOADES: Can you read that ok? Why don't you read it to us, so we know you are reading it alright. Go ahead and read it out loud. Do you understand that?

MONTOYA: Yes sir, I do.

(GX 4A at 1–2.) Although Rhoades asked Montoya to read the rights out loud, Montoya never did so.

Before any substantive questioning began, the following colloquy also occurred:

TROOPER RHOADES: We have to keep it [the interview] on tape, okay? ... Nobody else is going to get these tape recorders, but the police officers here investigating and, if in fact when it goes to court, if we need to we may have to play it 'cause you're attorney may want to hear it. You know, when you have your attorney?

MONTOYA: Yes.

TROOPER RHOADES: Okay, he may want to hear them, so he may also have these tapes.

(GX 4A at 2.)

Montoya then responded to questions during the interview and made incriminating statements essentially admitting transporting the cocaine from Miami to New York. (GX 4A.) Montoya also admitted that he gave Rhoades permission to search the station wagon, and although Montoya also stated he thought that he had no choice, Rhoades did not threaten him in any way. (GX 4A at 22–23.) Prior to Montoya's bail hearing before the Magistrate, he was interviewed by Eugene Mayhew, a Senior Probation Officer for the United States District Court. Mayhew testified that he asked Montoya if Montoya spoke and read English and that Montoya responded affirmatively to both questions. (Tr. at 102–03.) Montoya is a Colombian national who has resided in the United States for approximately five years, and was enrolled as a student in Elizabeth, New Jersey, for one and a half of those years. (Tr. at 112; GX 4A at 21.)

## CONCLUSIONS OF LAW

### 1. Montoya voluntarily consented to the search of the vehicle.[4]

█ It is axiomatic that a search conducted pursuant to a valid consent is an exception to the search warrant requirement and therefore constitutionally permissible. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The government has the burden of proving that a search is consensual; the burden of proving free and voluntary consent is by the preponderance of the evidence. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968); *United States v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974).

In *Schneckloth*, the Supreme Court held that "whether a consent to search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Id.* 412 U.S. at 227, 93 S.Ct. at 2047–48. In *United States ex rel. Harris v. Hendricks*, 423 F.2d 1096 (3d Cir.1970), the Third Circuit elucidated the critical factors comprising a totality of the circumstances inquiry. They include the setting in which the consent was obtained, the parties verbal and nonverbal actions, with particular emphasis on how the individual consenting to the search manifested such consent, and the age, intelligence and educational background of the consenting individual. *Id.* at 1099. Although the individual's knowledge of the right to refuse consent is also a factor to

---

**4.** The government contends, and Montoya disputes, that the cocaine would have been discovered by lawful means independent of Montoya's consent to the search. Because the Court rules that Montoya freely and voluntarily consented to the search of the automobile, it is unneces-

sary to address the "inevitable discovery" exception to the rule which excludes the use of evidence that is a fruit of unlawful police conduct. *See Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

be considered, the Supreme Court held in *Schneckloth* that "the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." 412 U.S. at 249, 93 S.Ct. at 2059.

◼ An application of the totality of the circumstances test to the facts adduced at the suppression hearing leads the Court to conclude that Montoya freely and voluntarily consented to the search of the station wagon. The setting in which the consent occurred, on the left hand shoulder of I–95 near the end of morning rush hour, is a public place which is significantly less "police dominated" than an interview or interrogation room at a police station. Montoya initially orally consented to the search as both he and Rhoades were standing outside of the two automobiles. After the search had already commenced, Montoya had another opportunity to reconsider his decision since Rhoades temporarily stopped the search and asked Montoya for a written consent. This pause in the search enabled Montoya to further reflect upon the desirability of letting the search continue, and Montoya again gave his go-ahead by signing the written consent form.

The interaction between Rhoades and Montoya also overlaps the second prong of the totality of the circumstance test. Montoya manifested his free and voluntary consent both verbally and non-verbally. Montoya's response to Rhoades' question, "You want to search the car? You go ahead, you search the car," is an unequivocal verbal authorization to search that was effectively communicated to Rhoades. Montoya also indicated his acquiescence in the search by simultaneously motioning to the car.

◼ Although Montoya contends that he thought he did not have a choice, Montoya's subjective unawareness of his right to refuse consent is not determinative in light of the Supreme Court's pronouncement in *Schneckloth* and its progeny. Further,

Montoya's authorization to search aptly demonstrates that he was aware of Rhoades' desire to search the vehicle. Rhoades further testified that he did not physically or verbally threaten Montoya, nor did he use any force against him.

Montoya, a native Colombian, has resided in the United States for approximately five years.[5] This fact, coupled with his forty-one years of age and one and a half years as a student in New Jersey, casts grave credibility problems on Montoya's claim that he did not understand the circumstances surrounding his consent to the search. Moreover, Senior Probation Officer Mayhew testified that Montoya told him he could speak and read English.

Hence, the conclusion that Montoya freely and voluntarily consented to the warrantless automobile search clearly follows from an evaluation of the totality of the circumstances. Accordingly, Montoya's Motion to Suppress the fruits of the search is denied.

**2. Montoya's pre-arrest statements are admissible at trial.**

The admissibility of Montoya's pre-arrest statements falls squarely within the Supreme Court's recent decision in *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). In *Berkemer*, after an Ohio state trooper observed a motorist's car weaving in and out of a highway lane, he forced the driver to stop and asked him to get out of the vehicle. When the driver complied, the trooper concluded that the motorist was driving under the influence of alcohol or drugs and decided that the driver would be charged with a traffic offense and taken into custody. However, the trooper did not notify the driver of his custodial intentions, but rather proceeded to ask the driver questions before placing him under arrest. Not being Mirandized until he was placed under custodial arrest, the defendant made incriminating state-

---

**5.** In *United States v. Marin,* 761 F.2d 426 (7th Cir.1985), the Seventh Circuit affirmed a district court conclusion that consent was knowingly and voluntarily given when a woman who had

been in the United States for nine years contended that she could not read or understand English. In so ruling, the court specifically found the defendant's contention not credible.

ments in response to the police officer's questions. *See Id.* at 3142.

The United States Supreme Court affirmed the denial of Berkemer's motion to exclude the pre-arrest incriminating statements on Fifth Amendment grounds, holding that the roadside questioning of a motorist detained pursuant to a routine traffic stop should not be considered a "custodial interrogation."[6] *Id.* at 3148. Hence, motorists temporarily restricted or constrained and questioned regarding traffic infractions need not be advised of their *Miranda* rights.

The Supreme Court identified two features of the ordinary traffic stop which distinguishes it from a custodial interrogation. First, the detention of a motorist at a traffic stop is usually temporary, with most roadside detentions lasting only a few minutes. The Court concluded that a motorist expects a certain number of questions incidental to the receipt or nonreceipt of a traffic citation, which is much different than a prolonged stationhouse interrogation. *Id.* at 3149–50.

Second, the Court distinguished a public traffic stop, where public visual exposure minimizes potentially unscrupulous police tactics and therefore diminishes the motorist's fear of abuse, from the pressurized atmosphere surrounding private police interrogations. *Id.* at 3150. In sum, the *Berkemer* Court found the aura of police authority surrounding a traffic stop, when compared to the aura of police authority surrounding a station house interview, to be a distinction with a difference.[7]

Although there may be a point in the questioning incidental to a traffic stop when a motorist may become "in custody," the Supreme Court's guidance on when this juncture may occur is unhelpful. On this issue, the Court remarked that "[i]f a motorist who has been detained pursuant to a traffic stop there-after is subject to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protection proscribed by Miranda." *Id.* at 3151. After evaluating the facts in *Berkemer*, the Court found that the defendant was not "in custody" until the point when he was arrested. *Id.* Hence, since Berkemer's detention prior to his custodial arrest had none of the indicia of a formal arrest, the court ruled that his pre-arrest statements were admissible against him.[8] *Id.* at 3152.

■ Here, Montoya's pre-arrest statements fall squarely within the Supreme Court's analysis in *Berkemer*. Prior to his

---

6. The holding that individuals are not "in custody" for the purposes of *Miranda* when they are questioned after a routine traffic stop is one of two pronouncements promulgated in *Berkemer*. The Court also held that a person subject to a custodial interrogation is entitled to be Mirandized, regardless of the nature or severity of the offense for which (s)he is suspected or arrested. *Id.* Thus, law enforcement officers are now required to give *Miranda* warnings to all individuals arrested or placed in custody as a suspect. *Berkemer* was a unanimous decision, with Justice Stevens concurring in the judgment but failing to join in the portion of the Court's opinion applicable to this case.

7. The Court contrasted *Berkemer* with *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (suspect arrested and questioned in his bedroom by four police officers) and *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) (defendant questioned by government agent while in jail). *See id.* at 3150 n. 28. Apparently, the Court also relied on the typical motorist's expectation that (s)he will be allowed to leave the scene of a traffic stop whereas the confinement which is coexistent with a police interrogation is more permanent and therefore necessitates *Miranda* warnings.

8. The troubling fact in the *Berkemer* case is that, although the police officer immediately concluded he was going to arrest Berkemer, he never communicated this intention to Berkemer. Nevertheless, the Supreme Court stated that "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Although there is support for this proposition, *see Beckwith v. United States*, 425 U.S. 341, 346–47, 96 S.Ct. 1612, 1616–17, 48 L.Ed.2d 1 (1976) (the compulsive aspect of custodial interrogations, not the strength or content of the government's suspicions at the time of questioning, motivated the Court to impose *Miranda* requirements for custodial interrogations), this arguably deceptive police tactic is not present in this case.

arrest, Montoya was temporarily detained for speeding and the failure to produce a vehicular registration. The reasonable person in the suspect's position would interpret this detention and attendant questions as temporary in nature. Trooper Rhoades' questions were directed at ascertaining why Montoya was unable to produce a valid registration. Montoya's failure to account for the absent registration led Rhoades to broaden the scope of his inquiry. Nonetheless, at no point during the conversation was Montoya informed that his detention would not be temporary. "Treatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest." *Id.* at 3152. Immediately after the cocaine was found, Montoya was arrested.

Thus, the Court concludes that Montoya was not taken "in custody" for the purposes of the requisite *Miranda* warnings until Trooper Rhoades arrested him. Accordingly, Montoya's statements made prior to the point of his arrest are admissible against him.

### 3. Montoya's taped statement was obtained in violation of the Miranda doctrine and is inadmissible.

In employing procedural safeguards to protect an individual's Fifth Amendment privilege against self-incrimination and Sixth Amendment right to counsel, the Supreme Court, in the seminal case of *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), opined:

[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.... As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any

questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.... [I]f the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Inasmuch as Montoya was orally informed of his *Miranda* protections, as well as provided a card on which his Fifth and Sixth Amendment rights were printed in both English and Spanish, the procedural safeguards prescribed in *Miranda* were unquestionably complied with. Hence, admissibility of the post-arrest interrogation turns on whether Montoya waived his Fifth and Sixth Amendment rights voluntarily, knowingly and intelligently. Since Montoya did not expressly waive his Fifth and Sixth Amendment rights, the government relies on the doctrine of implicit waiver sanctioned in *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Nonetheless, in *Butler*, the Court's trepidation in approving implicit waivers is exemplified by the following passage:

An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably necessary or sufficient to establish waiver ... As was unequivocally said in *Miranda*, mere silence is not enough. That does not mean that a defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant did not waive his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

*Id.* at 373, 99 S.Ct. at 1757.

▇ After carefully scrutinizing the transcript of Montoya's interrogation at

Troop 6, the Court concludes that waiver cannot be clearly inferred from the actions and words of Montoya because of the confusing and misleading statements made by the police officers and Drug Enforcement Administration agents conducting the interrogation. Accordingly, Montoya's incriminating statements were not made voluntarily, knowingly and intelligently.

There are two flaws that occurred during the custodial interrogation of Montoya. First, the government has not sustained its burden of proving that Montoya understood or comprehended all of his *Miranda* rights. This is because, although the transcript of the interrogation amply demonstrates that Montoya can converse in English, it does not necessarily follow that he can comprehend the nature of all the rights that flow from *Miranda*. In response to Rhoades' question "do you understand each of these rights I've explained to you?", Montoya responded "not too much. Can I read?" This verbal exchange represents an objective manifestation by Montoya of his lack of understanding of his *Miranda* rights.

Montoya was then handed the card with Spanish and English versions of his *Miranda* rights printed on it. Rhoades asked Montoya if he could read the card and to read the card out loud, but never read the *Miranda* card, as requested by Rhoades.

Even though Montoya responded negatively when later asked by Rhoades if he had any questions about "the card" or his rights, it would be pure speculation for the Court to conclude that Montoya manifested an understanding of his *Miranda* rights. In fact, the only evidence the government has that Montoya implicitly waived his *Miranda* rights is that Montoya did make incriminating statements during the course of the interrogation. The absence of an express waiver of Fifth and Sixth Amendment rights, when coupled with the second flaw in the interrogation, demonstrates that the government cannot sustain its burden of proving an implicit waiver of Miranda rights.

The second flaw of the interrogation focuses on the fact that it was taped. Before any substantive questioning began, Montoya expressed reservations about the presence of the tape recorder. Rhoades responded: "We have to, yes. We have to do that. We have to keep it on tape, okay?" This statement is coercive because Montoya was told that tape recording was a necessary prerequisite for the interrogation. In short, Rhoades did not respond to Montoya's reservations about the tape recorder in a way that suggested that Montoya had a choice about whether the interrogation needed to be taped; rather, Rhoades implied that tape recording the interview was a condition of it taking place. Indeed, this interpretation is consistent with Rhoades' testimony that he indicated to Montoya that Montoya *"would* be interviewed and taped." (Tr. at 31.) (Emphasis added.)

Rhoades' next instructions to Montoya were misleading, and in fact, contradicted the import of the *Miranda* warnings earlier given to Montoya. Rhoades told Montoya that "nobody else is going to get these tape recorders, but the police officers here investigating and, if in fact when it goes to court, if we need to we may have to play it 'cause your attorney may want to hear it." Although Montoya asked Rhoades if the tape was going to be played in court, Rhoades evasively failed to answer Montoya's question. (*See* GX 4A at 2.)

Moreover, Rhoades' statement that the only persons having access to the tape would be the investigating officers and Montoya's attorney is directly contrary to the *Miranda* warnings that any statements Montoya made could be used against him in court, which was undoubtedly the purpose of taping the interview. Montoya was also given the impression that the purpose of taping the interview was for the benefit of Montoya himself, so that his attorney could listen to the taped interview.

In light of the misleading statements given to Montoya, and the general obfuscation which permeated the preliminary questioning, the Court is compelled to conclude that the government has not sustained its burden of showing that Montoya voluntarily,

knowingly and intelligently waived his Fifth and Sixth Amendment rights.[9] Accordingly, Montoya's post-arrest recorded statements made at Troop 6 must be suppressed and therefore are excluded from evidence at trial.

## CONCLUSION

For the reasons previously discussed, the Court concludes that Montoya voluntarily consented to the search of the station wagon, his pre-arrest statements were made when he was not in custody for purposes of *Miranda*, and that Montoya did not waive his Fifth Amendment privilege against self-incrimination and Sixth Amendment right to counsel with respect to the taped interrogation at Troop 6. Accordingly, the fruits of the automobile search will be admissible at trial, any pre-arrest statements made by Montoya will be admissible at trial, and Montoya's tape recorded statements will be inadmissible at trial.

---

**9.** Even before Montoya was read his *Miranda* rights, Rhoades told Montoya that "I have to advise you of your rights, again, formally because *we are going to question you,* okay?" (GX 4A at 1.) (Emphasis added.) This statement is, again, at odds with the import of the *Miranda* warnings. Although Montoya's subsequent incriminating statements may be viewed as a mere submission to the authority of three law enforcement officers, such a conclusion is not required in light of the government's failure to demonstrate an implicit waiver of Montoya's Fifth and Sixth Amendment rights.