**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Luis James VALENCIA and Sergio Aguero, Defendants–Appellants.**

**Nos. 89–1648, 89–2369.**

United States Court of Appeals, Seventh Circuit.

Argued April 10, 1990.

Decided Sept. 13, 1990.

As Amended Oct. 31, 1990.

---

R. Jeffrey Wagner, Asst. U.S. Atty., Office of the U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Marna M. Tess–Mattner, Thomas E. Brown, Gimbel, Reilly, Guerin & Brown, Russell L. Stewart, Milwaukee, Wis., and Ari M. Trubitt, Kreiter & Associates, Chicago, Ill., for defendants-appellants.

Before CUDAHY, COFFEY and MANION, Circuit Judges.

MANION, Circuit Judge.

A jury convicted Luis Valencia and Sergio Aguero for conspiring to possess, with the intent to distribute, cocaine. See 21 U.S.C. §§ 841(a)(1) and 846. The district court sentenced both defendants under the Sentencing Guidelines. Valencia received a prison term of 235 months, and Aguero received a term of 145 months. Valencia and Aguero appeal their convictions and sentences.

## I. VALENCIA

### A. Motion to Suppress

Valencia argues that we must reverse his conviction because the district court erred in denying his motion to suppress evidence found in a warrantless search of his apartment. Following a hearing on Valencia's motion, the district court found the following pertinent facts. Early in November 1988, Joe Hummel, who had been arrested in Florida for possession of cocaine, agreed to act as an informant for the Drug Enforcement Administration. Hummel told DEA Agent Steve Collins that he had been involved in cocaine transactions with Andres Zuniga. Zuniga had recently contacted Hummel and had told Hummel about Colombian contacts in Milwaukee who wished to purchase cocaine. Hummel subsequently set up a deal with Zuniga to deliver 15 kilograms of cocaine to Milwaukee.

On November 19, Hummel and Collins (who was posing as the cocaine's owner) traveled from Florida to Milwaukee. The next day, Zuniga and Aguero met Collins at the motel where he was staying. Zuniga told Collins that his "money man" would pay $250,000 for the cocaine, but with one catch: Zuniga's "money man" wanted Collins to front one kilogram of cocaine so that he could check the cocaine's quality. Collins responded that he would not release any cocaine until he received advance payment. Zuniga then told Collins he would talk to his "money man."

Zuniga and Aguero left the hotel and went to a shopping mall where Aguero placed a call on a pay telephone. After making the call, Aguero and Zuniga went to Aguero's apartment, and then back to the motel. At the motel, Collins, at Aguero's request, showed Aguero a kilogram of cocaine. Aguero tested the cocaine and indicated that he approved of its quality. Aguero then told Collins that his "money man" lived on Milwaukee's south side, approximately one-hour's round trip from the motel. Aguero told Collins that although he and the "money man" usually received a kilogram of cocaine in advance before releasing any funds, Aguero would go and see his "money man" to determine if he could get enough money to purchase a kilogram. Aguero stated that he was not permitted even to take Zuniga with him to the meeting.

Zuniga and Aguero left the motel at approximately 2:35 p.m. Aguero dropped Zuniga off at a restaurant, drove to an apartment building at 3415 South 113th Street in Milwaukee, and went into apartment 2. About 45–50 minutes later (around 3:55 p.m.), Aguero left apartment 2. He picked up Zuniga from the restaurant where he had dropped Zuniga off, and drove to the motel. Back at the motel, Aguero told Collins that he had seen the "money man" at his residence but the "money man" had refused to release any money until Collins fronted one kilogram of cocaine. At that point, agents arrested Aguero and Zuniga.

In the meantime, surveillance officers had seen Valencia leave apartment 2 about ten minutes after Aguero had left. After Aguero and Zuniga had been arrested, DEA Agent Jerry Snyder, who supervised the Milwaukee DEA office and was overseeing this case, directed Milwaukee police officers to find and stop Valencia. Snyder also directed Milwaukee police officers at the scene of Valencia's apartment to enter it, secure it, and remain in it until they

received further orders. At about 4:45 p.m., a police officer rang the apartment's doorbell. Patricia Perez, who lived with Valencia, opened the door. Other officers, without Perez's consent, then entered the apartment and looked through the apartment's rooms and closets to make sure nobody else was there.

While Valencia's apartment was being "secured," other officers found and stopped Valencia. Snyder was notified that Valencia had been stopped, and he went to the scene. Valencia was with his two children, at least one of whom spoke English. Valencia himself spoke little English. Snyder was able to speak with Valencia to some extent through the child, but found that communication was difficult, so he arranged to have a Spanish-speaking Milwaukee police officer, Johnny Santiago, go to Valencia's apartment. Snyder then drove Valencia, in Valencia's automobile, to his apartment.

When Snyder and Valencia arrived at the apartment, other police officers had already been there for about one hour. However, beyond their brief inspection to ensure that nobody else was in the apartment, the officers had not searched the apartment or seized any property from it. Santiago read Valencia his *Miranda* rights in Spanish; Valencia stated he understood those rights. Santiago proceeded to ask Valencia questions from Snyder. During the questioning, Valencia appeared calm, and the officers took no threatening actions. In response to Santiago's questions, Valencia volunteered that there was some marijuana in his kitchen, and $8,000 to $10,000 and a .357 magnum revolver in his bedroom. The officers found these items in the locations Valencia indicated. Santiago then asked Valencia whether he would consent to a search of his apartment, explaining to Valencia that he did not have to consent to the search. Valencia indicated that he understood he did not have to consent but told the officers to go ahead and search. During the search, police officers discovered $316,000 and another handgun.

At trial, the government introduced the evidence the agents discovered while searching Valencia's apartment. Valencia argues that the district court should have suppressed this evidence for three reasons. First, Valencia contends that his consent was not voluntary. Second, Valencia contends that the initial entry into his apartment was illegal, and that his consent resulted from, and was thus tainted by, this illegal entry. Finally, Valencia contends that his consent directly resulted from his stop and detention, which he contends constituted an illegal arrest without probable cause.

Police may search premises without a warrant if a party who possesses authority over the premises consents to the search. See *Illinois v. Rodriguez*, —— U.S. ——, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). However, the prosecution must show that the consent was given freely and voluntarily. *Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2045. Whether a person has voluntarily consented to a search is a factual question to be determined by examining all the circumstances surrounding the consent. *Id.* at 227, 93 S.Ct. at 2047–48; *United States v. Marin*, 761 F.2d 426, 433 (7th Cir.1985). We will overturn a district court's finding that a consent to search was voluntary only if that finding was clearly erroneous. See *id.; United States v. Colonia*, 870 F.2d 1319, 1324 (7th Cir. 1989).

■ The district court did not clearly err in finding Valencia voluntarily consented. Valencia had been detained only a short time before he consented. The officers and agents in his apartment did not threaten him in any way, and Valencia remained calm during the entire proceeding. He never refused to allow the search. Finally, and perhaps most significantly, Valencia was given *Miranda* warnings and informed that he did not have to consent to any search, and he indicated that he understood those rights. See *United States v. Morgan*, 725 F.2d 56, 58 (7th Cir.1984). Given these circumstances, the district court could properly find that Valencia voluntarily consented to the search.

■ The next issue is whether the allegedly illegal initial entry into Valencia's apartment by Milwaukee police officers "tainted" Valencia's subsequent consent. The police who initially entered Valencia's apartment discovered no evidence as a direct result of that entry. But the Fourth Amendment's exclusionary rule " 'extends as well to the indirect as the direct products' of unconstitutional conduct." *Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984) (quoting *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963)). In determining whether evidence is tainted by a prior illegality, we must determine whether the evidence was " 'come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint.' " *Id.* (quoting *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417–18) (emphasis added in *Segura* ).

If the initial entry was not illegal, the question of taint becomes irrelevant. The district court did not, however, decide whether the initial entry violated the Fourth Amendment and neither do we. Even assuming the initial entry was illegal, we agree with the district court that that entry did not taint Valencia's subsequent consent. More than an hour passed between the initial entry and Valencia's subsequent consent. The agents did not exploit the initial entry. The police found no evidence as a result of that entry, and discovered no information that they used (or could use) to influence Valencia to consent to a search. Valencia points to the allegedly coercive effect of the officers' mere presence in his apartment. However, as we have seen, the district court found Valencia's consent to be free and voluntary. Implicit in this finding is the conclusion that the officers' presence did not coerce Valencia's consent. Indeed, the district court explicitly found no evidence of any nexus between the initial entry and the consent. Given all these factors, we conclude that Valencia's consent was sufficiently independent of the allegedly illegal initial entry that the two events were "so attenuated as to dissipate [any] taint" from the entry. See *Segura*, 468 U.S. at 805, 104 S.Ct. at 3385.

This brings us to Valencia's third argument in challenging the search of his apartment—the legality of his stop and detention. If the agents illegally seized Valencia, the illegal seizure would have tainted his subsequent consent, since his consent presumably was the product of his detention. See *Morgan*, 725 F.2d at 58 (citing *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). The district court held that Valencia's initial stop was justified because the police had a "reasonable articulable suspicion" that Valencia was involved in the cocaine deal with Aguero and Zuniga. This reasonable suspicion allowed the officers to briefly detain Valencia to investigate their suspicions. See *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The court further held that it was proper to move Valencia back to his home because there was a good reason for moving Valencia (the need for a translator to speak with Valencia), and because taking Valencia to his home did not intrude on Valencia's privacy interests any more than the stop already had otherwise. Cf. *United States v. Vanichromanee*, 742 F.2d 340, 344–45 (7th Cir.1984).

Valencia argues that the district court's decision is wrong because the court's premise—that the stop and detention was a *Terry* stop—is wrong. Instead, says Valencia, the stop and detention were really an arrest requiring probable cause. Valencia argues that the information the police had did not amount to probable cause to believe he was involved in any cocaine deal. If Valencia is correct that the police lacked probable cause, we must determine whether Valencia's stop amounted to an arrest or a *Terry* stop. Fortunately, we do not have to consider the often subtle questions about what differentiates an arrest from a *Terry* stop, or when a *Terry* stop becomes an arrest, because we conclude that the police had probable cause to arrest Valencia when they initially stopped him.

■ Probable cause involves a practical, common sense determination about whether, given all the circumstances present, it is reasonably probable that a person has committed or is committing an offense. See

*Marin,* 761 F.2d at 430–31; see also *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). The police who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency. In that case, the arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause. See *United States v. Rodriquez,* 831 F.2d 162, 165–66 (7th Cir.1987); *United States v. Scott,* 678 F.2d 606, 611 (5th Cir.1982); see generally 2 Wayne R. LaFave, *Search and Seizure* § 3.5(b) (2d ed. 1987).

■ In this case, Milwaukee police officers stopped Valencia at the request of DEA agent Snyder, the head of the Milwaukee DEA office and the agent overseeing the investigation in this case. Valencia does not contend that the officers acted unreasonably in stopping him at Snyder's direction; he argues only that the knowledge the DEA had when Snyder ordered him stopped was not sufficient to constitute probable cause. But when the officers stopped Valencia, the DEA knew that a third person besides Aguero and Zuniga— the "money man"—was involved in the cocaine deal. Aguero had told Agent Collins that he was going to visit the "money man" at the "money man's" residence, which was about one-half hour away, and that he was not even permitted to take Zuniga with him. According to surveillance officers, Aguero made only three stops after leaving the motel: twice at a restaurant (once to drop Zuniga off and later, on the return trip, to pick Zuniga up); and at an apartment building, at which he arrived about one-half hour after leaving the motel. Officers saw Aguero enter apartment 2, and 45–50 minutes later, leave that apartment. Officers also saw Valencia leave the apartment a short time after Aguero. Back at the motel, Aguero told Collins he had seen and spoken to the "money man."

From these facts, DEA agents could reasonably conclude that the apartment where Aguero stopped was the "money man's" apartment and that Aguero had spoken to the "money man" during the time he was there: it was the "money man" Aguero had gone to see, apartment 2 was the only stop he made other than his stops at the restaurant, and Aguero told Collins he had seen the "money man." The DEA agents could also reasonably conclude that Valencia was in the apartment at the same time as Aguero; officers saw Valencia leave the apartment shortly after Aguero left. Valencia argues that these facts did not constitute probable cause because at the time he ordered Valencia stopped, Snyder did not know Valencia lived in apartment 2. (Snyder testified at the suppression hearing that one of the reasons he wanted Valencia stopped was to find out for sure whether Valencia lived in apartment 2.) There are two problems with that argument, however. The first is that the district court found that after Aguero went to apartment 2, the DEA "learned through the Milwaukee County Metropolitan Drug Enforcement Unit that, based on previous investigations, [Valencia] lived in Apartment 2." This finding has evidentiary support, and is not clearly erroneous, despite Snyder's testimony about his uncertainty as to Valencia's residence. Thus the DEA, collectively, knew that apartment 2 was Valencia's; since it was reasonable to conclude that Aguero had gone to see the "money man," who lived in apartment 2, it was reasonable to conclude Valencia was the "money man."

Moreover, even if Snyder's testimony indicates the DEA's collective uncertainty about Valencia's residence, it would still have been reasonable to conclude that Valencia probably was involved in the cocaine deal as the "money man." This is so because of Aguero's statement that he could not even bring Zuniga (who was intimately involved in the transaction) with him to see the "money man." Aguero's apparent concern for secrecy could reasonably lead to the conclusion that outsiders to the deal (unless they were closely related to the "money man") would not be in the apart-

ment at the same time Aguero was speaking to the "money man." Cf. *United States v. Pace*, 898 F.2d 1218, 1240 (7th Cir.1990) (fact that a person was present in a private apartment where police could reasonably believe a drug deal was going on could give rise to suspicion that the person was involved in the deal); *United States v. Perry*, 747 F.2d 1165, 1169 (7th Cir.1984) ("it strikes us as incredible that [a drug dealer] would have a person accompany him to a ... drug deal ... where that person did not have [the dealer's] utmost trust and confidence"; reasonable to conclude that trust most likely arose because the person with the dealer was involved in the deal). Since the police could reasonably believe Valencia was in the apartment while Aguero was speaking with the "money man," they could reasonably believe Valencia was involved in the deal, probably as the "money man."

Aguero's apparent concern for secrecy distinguishes this case from *United States v. Ingrao*, 897 F.2d 860 (7th Cir.1990). In *Ingrao*, police saw Ingrao walking down a gangway between two houses in which they had just seen what they reasonably suspected to be a drug deal. *Id.* at 863. One of the known participants in the deal lived in one of the houses the gangway serviced. We held that the officers' observing Ingrao on the gangway by itself was insufficient to give police probable cause to arrest Ingrao, even assuming that Ingrao had just left the known drug dealer's house. See *id.* at 863, 865. There was nothing else to connect Ingrao to any drug transaction and his mere association with a drug dealer was not enough to create probable cause absent other circumstances indicating Ingrao was involved in criminal activity. *Id.* at 864, 865. In our case, Aguero's apparent concern with secrecy (he couldn't even allow Zuniga to see the "money man") provided the additional fact needed; it created a reasonable inference that anybody present during the money discussions was probably involved in the deal. Since the police had probable cause to arrest Valencia, the district court did not err in refusing to suppress the evidence found in his apartment because his consent to search was the product of an illegal arrest.

*B. Sentencing*

 Besides challenging his conviction, Valencia also argues that the district court erred by increasing his base sentencing level by two levels for possessing a firearm. Sentencing Guideline § 2D1.1(b) provides for a two-level increase "[i]f a firearm or other dangerous weapon was possessed during the commission of [a drug] offense,...." As we have noted, police found two handguns in Valencia's apartment, one of them a loaded .357 Magnum revolver. Valencia argues that the handguns' mere presence in his apartment was not sufficient to call for § 2D1.1(b)(1)'s enhancement. According to Valencia, the guns were not easily accessible, one being in a closet and the other in a drawer; no guns were displayed or mentioned during the entire discussion at the motel; and the actual sale was to occur at the motel, not at his apartment.

Valencia's argument is unpersuasive. Application Note 3 to § 2D1.1(b)(1) states in relevant part:

> The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is *clearly improbable* that the weapon was connected with the offense....

(Emphasis added.) Though not formally binding, the Sentencing Commission's notes are normally entitled to "substantial weight" when we interpret the guidelines. See *United States v. McNeal*, 900 F.2d 119, 123 n. 5 (7th Cir.1990); see also *United States v. Pinto*, 875 F.2d 143, 144 (7th Cir.1989). The application note indicates that § 2D1.1(b)'s enhancement normally applies when weapons are present during a drug offense; the exception occurs when it is "clearly improbable that the weapon was connected with the offense." Whether an event is "clearly improbable" is a fact question, so we will not overturn the district court's decision to enhance a sentence under § 2D1.1(b) unless it is clearly errone-

ous. See *United States v. Franco–Torres*, 869 F.2d 797, 800 (5th Cir.1989). The district court did not clearly err in applying § 2D1.1(b). Handguns are a common "tool of the trade" of drug dealers. Valencia was involved in a large-scale cocaine transaction and had $316,000 in his home, money that one could reasonably infer was for use in the transaction. It takes no great leap of logic to infer that Valencia would want to protect that money, and that the handguns in his home helped to serve that purpose. There was a sufficient nexus between the handguns and Valencia's offense so that the district court could reasonably find that it was not "clearly improbable" that the guns were not connected to Valencia's offense. Cf. *United States v. Franklin*, 896 F.2d 1063, 1065–66 (7th Cir.1990); *United States v. Rush*, 890 F.2d 45, 52 (7th Cir.1989). Valencia's sentence was proper.

## II. AGUERO

### A. Limitation on Collins' Cross–Examination

■ When Hummel began working as an informant for the DEA, Agent Collins debriefed him. Much of what Hummel said at these debriefing sessions was contained in investigative reports (DEA–6 reports) Collins prepared after interviewing Hummel. These reports contained statements by Hummel concerning Hummel's prior cocaine dealing with Zuniga and Aguero that varied from Hummel's trial testimony. At trial, Aguero's attorney wanted to impeach Hummel with his prior statements to Collins. However, instead of confronting Hummel directly with those statements when he cross-examined him, he attempted to introduce the statements while cross-examining Collins (who testified after Hummel). The government objected, and the district court would not allow Aguero's attorney to cross-examine Collins about the statements. At first, the judge excluded the questioning as calling for hearsay. Later, after Aguero's attorney made clear he was introducing the statements not for their truth but only to impeach Hummel, the judge excluded the questioning on the grounds that Aguero's attorney had not laid a sufficient foundation because he had failed to confront Hummel with the statements during Hummel's cross-examination. However, upon a stipulation between the government and Aguero, the judge did allow Aguero to introduce the DEA–6 reports directly into evidence to show Hummel's alleged inconsistent statements.

According to Aguero, the district court erred by not allowing his attorney to cross-examine Collins about Hummel's statements. Aguero says this is so because Fed.R.Evid. 613(b), which governs the use of extrinsic evidence of prior inconsistent statements, does not require the statement's proponent to confront a witness with his prior inconsistent statements before introducing extrinsic evidence of those statements. Rather, Aguero contends, since the government could have recalled Hummel to the stand during rebuttal to explain or deny the prior statements, any foundation requirement imposed by Rule 613(b) was satisfied. See generally *Wammock v. Celotex Corp.*, 793 F.2d 1518, 1521–22 (11th Cir.1986), and the cases it cites; but see *United States v. Elliott*, 771 F.2d 1046, 1051 (7th Cir.1985) (upholding the district court's refusal to allow evidence of a witness's prior inconsistent statements because the witness had not been questioned about the remarks).

Even if the district court technically erred by not allowing Aguero's attorney to cross-examine Collins about Hummel's prior statements, any error was harmless. See Fed.R.Evid. 103(a). Hummel's prior statements did get to the jury because the district court admitted Collins' DEA–6 reports. (This makes it questionable whether there was any error at all.) Aguero was thus able to impeach Hummel's credibility by way of his prior statements, the very objective he sought by his proposed cross-examination. Moreover, the case against Aguero was very strong. Aguero was tape-recorded negotiating the cocaine deal with Collins. He was arrested immediately after returning from a house he identified as his "money man's" residence, and after telling Collins that he had just spoken to his "money man." Aguero complains that introducing the DEA–6 reports was not as

effective a means of impeaching Hummel as questioning Collins about those statements would have been. That is questionable; but even accepting that premise, we doubt that being able to use the more effective impeachment method would have changed the jury's verdict in light of the case against Aguero.

### B. Sentence

 Aguero also makes one argument concerning his sentence. At sentencing, Aguero asked the district court to depart below the applicable guideline range because of his substantial assistance in other government investigations. See Sentencing Guideline § 5K1.1. The district court refused to depart because § 5K1.1 allows a departure only upon the government's motion. Aguero argues now that § 5K1.1's government motion requirement violates his right to due process.

Aguero claims he challenged § 5K1.1's constitutionality in the district court. He is wrong. Never in the district court did Aguero make the due process argument he makes now. In fact, Aguero's attorney at the sentencing hearing told the judge, "I am not going to use this case as the forum ... about what I view to be some very significant constitutional questions about placing the entire mantle of the ability [to depart] on the government...." Aguero did not want to challenge § 5K1.1's constitutionality in the district court; he should not expect to be able to do so here.

However, since the government has not argued waiver, we will briefly discuss the merits of Aguero's arguments. In *United States v. Lewis*, 896 F.2d 246 (7th Cir.1990), we held, in accord with all other circuits that have considered the issue, that § 5K1.1's government motion requirement does not violate due process. Aguero presents a slight variation on the argument presented in *Lewis:* according to Aguero, § 5K1.1 does not meet the balancing test set out in *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18

(1976) for determining what process is due in a particular situation. Aguero's argument fails because it presupposes a right to have the court consider his assistance to the government in sentencing. No such right exists. See *Lewis*, 896 F.2d at 249. Since Congress did not have to provide any substantial assistance reduction, Congress could reasonably condition any reduction it did provide. In *Lewis*, we found that the government motion requirement was a reasonable condition. *Id.* Nothing in Aguero's argument persuades us to change our view. Section 5K1.1's government motion requirement does not violate due process, and the district court correctly refused to consider Aguero's purported assistance as a ground for departure.

### III.

For the reasons set forth, we affirm Valencia's and Aguero's convictions and sentences.

AFFIRMED.