UNITED STATES of America, Plaintiff–Appellee,

v.

Scott OBIUWEVBI, Defendant–Appellant.

No. 91–2070.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1992.

Decided April 27, 1992.

See also 788 F.Supp. 351.

Lance C. Malina, Asst. U.S. Atty. (argued), Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Kent R. Carlson (argued), Pomper & Associates, Stephen J. Broussard, Chicago, Ill., for defendant-appellant.

Before FLAUM, EASTERBROOK, and MANION, Circuit Judges.

MANION, Circuit Judge.

In December 1989, Scott Obiuwevbi, a Nigerian national living in the United States, planned to fly from O'Hare Airport in Chicago to Lagos, Nigeria. But Obiuwevbi's plans were scuttled at the boarding gate by United States Customs Service agents who were conducting an operation (appropriately named "Buck Stop") designed to enforce United States currency reporting requirements. Federal law requires that any person entering or leaving the United States with $10,000 in United States currency or cash equivalents (money orders, etc.) declare the amount on a United States Customs form. See 31 U.S.C. § 5316. Obiuwevbi was carrying over $24,-000 in cash with him to take to Nigeria but had not filled out a currency reporting form.

Customs Inspector Robert Personett stopped Obiuwevbi as he was preparing to board his flight, explained the reporting requirements to him, and asked him a series of questions about who he was, where he was going, and how much money he was carrying. Obiuwevbi's answers to two of those questions form the basis for this case. A grand jury found that those answers were false and returned a one-count superseding indictment charging Obiuwevbi with violating 18 U.S.C. § 1001, which prohibits knowingly and willfully making false statements or misrepresenting material facts regarding matters within the jurisdiction of any agency of the United States.[1] At trial, Obiuwevbi maintained that his alleged misstatements resulted from confusion and misunderstanding rather than any intent to knowingly and willfully lie. The jury disagreed and convicted him. The district court, applying guideline § 2S1.3, the sentencing guideline applicable to currency reporting crimes, rather than § 2F1.1, the guideline normally applicable to frauds and false statements, sentenced

---

1. The grand jury originally charged Obiuwevbi with violating currency reporting laws as well as with making a false statement. See 31 U.S.C. § 5322, which sets out criminal penalties for violating currency reporting requirements. After his encounter with Personett, Obiuwevbi did sign a currency report. Perhaps based on this fact (the record is not entirely clear), the government decided to drop the currency reporting count "for prosecutorial policy reasons and trial strategy."

Obiuwevbi to twelve months imprisonment. Obiuwevbi appeals both his conviction and sentence, raising three issues.

## A. Sufficiency of the Evidence

■ The indictment charged Obiuwevbi with falsely stating to Personett that he was carrying a total of between $6,000 and $7,000 in cash and that he was not wearing anything around his waist area when in fact he was carrying over $24,000 in cash, almost $17,000 of which was concealed in a pouch in the waist of his pants. Obiuwevbi contends that the evidence was insufficient for a reasonable jury to find beyond a reasonable doubt that he knowingly or willfully lied to Personett. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We disagree.

Personett testified that when he approached Obiuwevbi, he first asked him if Obiuwevbi was aware of the currency reporting requirements. Obiuwevbi, who had traveled to Nigeria several times before and had filled out currency reports during flights returning to the United States, replied that he was aware of the requirement that people bringing currency into the United States prepare a report but that he was not aware of any similar requirement for people taking currency from the United States. Personett then explained the reporting requirements to Obiuwevbi; Obiuwevbi responded that he understood what Personett was explaining.

After explaining the reporting requirements, Personett began to ask Obiuwevbi questions about the amount of cash he was carrying. Personett asked Obiuwevbi whether he was "carrying any envelopes for anyone?" Obiuwevbi responded that he was. Personett then asked if those envelopes contained any currency. Obiuwevbi replied that the envelopes contained "about $3,000." Personett then asked the key question: "How much currency are you carrying in total?" Obiuwevbi stated that he was carrying approximately $6,000–$7,000 in cash. Personett searched Obiuwevbi's handbag and found $6,100.

Personett was not satisfied and decided to conduct a pat-down search of Obiuwevbi. During the pat-down, Personett asked Obiuwevbi if he was "wearing any sort of a money belt in the waist area?" Obiuwevbi said he was not. However, Personett felt a bulge in Obiuwevbi's waist area that he asked Obiuwevbi to remove. The bulge turned out to be a concealed pouch in the waist of Obiuwevbi's pants that contained over $17,000 in cash. Obiuwevbi was also carrying another $600 in his wallet.

As at trial, Obiuwevbi contends that any misstatements he made resulted from misunderstanding and confusion and were not knowingly and willfully false. Obiuwevbi contends that his misstatements about the total amount of cash he was carrying resulted from Personett's preceding questions about how much cash he was carrying for other people. Those questions, says Obiuwevbi, led him to think that Personett was asking him only how much cash he was carrying for other people. Because of this, he did not include in his answer the amount of his own cash he was carrying. Obiuwevbi also contends that when Personett asked him if he was wearing a money belt, he answered truthfully; even though he was carrying money at his waist, it was contained in a pouch in his pants, not in a money belt. Obiuwevbi also contends that his problems with understanding the English language contributed to his misunderstanding and confusion.

Obiuwevbi was free to make these arguments to the jury. The jury, in turn, was free to reject them. First, the jury could reasonably conclude that Obiuwevbi understood English well enough to understand what Personett was asking him. Obiuwevbi had lived in the United States for 22 years and had an engineering degree from Illinois State University. Besides, one of Obiuwevbi's own witnesses, a fellow Nigerian, testified that English is Nigeria's "national language" and that "we do everything in English in Nigeria."

Nor was the jury compelled to accept Obiuwevbi's other rationalizations for his false answers to Personett. Personett testified that he asked Obiuwevbi about the "total" amount of currency Obiuwevbi was carrying. Obiuwevbi was carrying more

than \$6,000 to \$7,000 and the jury could reasonably find that he knew he was carrying more than that. Over half the money he was carrying was his own money; even if he did not know the exact amount, he had to know it was more than enough, when combined with money he was carrying for friends, to total much more than \$7,000. And even if Obiuwevbi really thought Personett asked him about money he was carrying for others, the jury could conclude his answer was knowingly false. Obiuwevbi's own witnesses testified that they had given him a total of more than \$10,000 to take to Nigeria and that Obiuwevbi had counted the money or they had counted it in front of him.

Moreover, Obiuwevbi was carrying between \$6,000 and \$7,000 in his handbag and wallet. This was money a Customs agent could easily find (and that Personett easily did find). The jury could reason that Obiuwevbi told Personett that he was carrying between \$6,000 and \$7,000 so that Personett would be satisfied upon finding that amount and allow Obiuwevbi to board his flight without any further inquiry or search.

As for Obiuwevbi's second alleged false statement, it is true that Obiuwevbi was not literally wearing a "money belt." But the context of Personett's question and Obiuwevbi's answer were sufficient to demonstrate to a reasonable jury that Obiuwevbi's response to Personett's question about the money belt was intended to mislead Personett. Personett asked if Obiuwevbi was "wearing any *sort of* a money belt in the *waist area.*" This question was arguably broader than a simple question about whether Obiuwevbi was wearing "a money belt." Obiuwevbi knew Personett was looking for currency. Obiuwevbi also knew that he was carrying a significant amount of money in a pouch in the waist of his pants. Obiuwevbi had just lied about the total amount of cash he was carrying. The most likely reason for this lie was to evade the currency reporting requirement. The jury could reasonably conclude from all this that Obiuwevbi's answer to Personett was a deliberate falsehood designed to conceal the amount of cash he was carrying rather than an innocently literal response to a question, the implications of which he did not fully grasp.

## B. Other Acts Evidence

Obiuwevbi's second argument is that the district court abused its discretion by admitting evidence that he says should have been excluded as other acts evidence under Fed.R.Evid. 404(b). Obiuwevbi complains about three categories of evidence. The first is evidence that Obiuwevbi withdrew over \$14,000 from his personal bank accounts in the month preceding his aborted trip to Nigeria. The second is evidence that Obiuwevbi had flown to Nigeria five times in the previous five years and that before each of his annual trips, he withdrew large amounts of money from his bank accounts. The third category is evidence that while returning home from four of his previous trips to Nigeria, Obiuwevbi filled out and signed customs declaration forms that contained the currency reporting requirements for both incoming and outgoing travelers.

■ Evidence of other acts is inadmissible to prove that a person has a bad character and that he acted consistently with that bad character. Fed.R.Evid. 404(b); *United States v. Monzon,* 869 F.2d 338, 344 (7th Cir.1989). But evidence of other acts is admissible if used to prove some other fact at issue in a case, such as motive, intent, plan, or knowledge, and if the evidence's potential for unfair prejudice does not substantially outweigh its legitimate probative value. Fed.R.Civ.P. 404(b); Fed.R.Evid. 403; *Monzon,* 869 F.2d at 344.

■ Obiuwevbi's principal argument is that the other acts evidence was not relevant to any issue in this case. He is wrong. Obiuwevbi's defense was that he did not intend to lie because he did not understand what Personett was asking him and because he honestly did not know how much money he was carrying. Obiuwevbi's knowledge and intent were at issue and the evidence Obiuwevbi complains about was relevant to his knowledge and intent. The most likely motive (perhaps the only

possible motive) Obiuwevbi had to lie to Personett was to avoid the currency reporting requirement. Therefore, it was appropriate for the government to show that Obiuwevbi knew about the currency reporting requirement and knew that he was carrying enough cash to be subject to the reporting requirement.

■ The evidence concerning the customs declaration forms Obiuwevbi completed and signed on previous trips is relevant to his knowledge of the currency reporting requirements imposed on outgoing travelers. While Obiuwevbi filled in these forms while returning to the United States, the forms included the reporting requirements for outgoing as well as incoming travelers. Directly above Obiuwevbi's signature, each form states that "I have read the above statements and made a truthful declaration." Thus, by signing the forms, Obiuwevbi acknowledged that he had read the statements contained on the forms, including the currency reporting requirements for outgoing travelers. This tends to show that Obiuwevbi knew about the outgoing reporting requirement. At the very least, by showing that Obiuwevbi knew and understood the incoming reporting requirements the forms tended to make it more likely that Obiuwevbi understood the outgoing reporting requirements when Personett explained them.

■ The evidence concerning Obiuwevbi's bank withdrawals was also relevant. Shortly before every trip he made to Nigeria, Obiuwevbi withdrew large amounts of cash. His withdrawals in the weeks immediately preceding his last scheduled trip were consistent with this pattern. The consistent concurrence between Obiuwevbi's large cash withdrawals and trips to Nigeria raised the inference that Obiuwevbi routinely carried large sums of his own money with him to Nigeria. This raises the further inference that, consistent with this routine, Obiuwevbi was carrying a large amount of his own money when he was attempting to leave on his last trip. This, in turn, makes it more probable that Obiuwevbi knew how much money he was carrying or that he at least knew that the total amount was significantly greater than $10,000 and that he was therefore required to report that amount.

■ Obiuwevbi hints that any evidence of what he did before and during his previous trips to Nigeria, one to five years before the crime with which he was charged, was too remote in time to be relevant. The proximity in time of similar acts can be important in determining whether evidence of those acts should be admitted under Rule 404(b). For example, evidence that Obiuwevbi once read currency reporting requirements in 1980 might not by itself be particularly convincing evidence about his knowledge of reporting requirements in 1989, given the fact that memories tend to dim over time. But "how long is too long" depends on the context in which the evidence is introduced and the theory supporting the evidence's admissibility. See *United States v. Beasley*, 809 F.2d 1273, 1277 (7th Cir.1987). In this case, the evidence showed a consistent pattern of acts by Obiuwevbi. It is the fact that Obiuwevbi repeatedly performed the same acts, not the isolated acts, that helped the jury assess Obiuwevbi's knowledge and intent. The fact that Obiuwevbi read and signed the customs reports four times raises a much stronger inference that he knew what was on those forms than would have been raised if he had read and signed the forms only once several years earlier. Similarly, it was Obiuwevbi's consistent pattern of making large withdrawals before flying annually to Nigeria that raised the inference that he routinely took large sums of money with him. Since Obiuwevbi took annual trips over a course of years, it was not unreasonable to reach back several years to establish his course of conduct. Cf. *United States v. DeCastris*, 798 F.2d 261, 265 (7th Cir.1986) (similar acts 10 years before the crime charged admissible as part of a pattern).

■ Obiuwevbi does not make much of an argument that the danger of unfair prejudice substantially outweighed the evidence's probative value regarding knowledge and intent. In any event, the danger of unfair prejudice was slight; withdraw-

ing one's own money from banks, flying overseas, and filling out customs forms are not the types of acts likely to arouse a jury's emotions. Moreover, the district court carefully instructed the jury concerning the proper uses of all the evidence that Obiuwevbi objects to. The district court did not abuse its discretion by admitting that evidence.

## C. Sentencing

■ Obiuwevbi contends that the district court erred by determining his offense level according to sentencing guideline § 2S1.3(a), the guideline for currency reporting crimes, rather than § 2F1.1, the guideline generally applicable to violations of 18 U.S.C. § 1001. This argument, however, ignores the language of the two guidelines and their commentary.

Guideline § 1B1.2(a) requires the sentencing court to "[d]etermine the offense guideline section in Chapter Two (offense conduct) most applicable to the offense of conviction (i.e., the offense conduct charged in the count of the indictment ... of which the defendant was convicted)." It is true that § 2F1.1 generally applies to false statement convictions under § 1001. But application note 13 to § 2F1.1 states that if the indictment "establishes an offense more aptly covered by another guideline, apply that guideline." This application note is entitled to "substantial weight," and Obiuwevbi has given no reason, such as conflict with the guideline's language, to disregard it. See *United States v. Valencia*, 913 F.2d 378, 384 (7th Cir.1990); *United States v. Pinto*, 875 F.2d 143, 144 (7th Cir.1989).

Before its amendment in November 1991 (well after the district court sentenced Obiuwevbi), guideline § 2S1.3(a)(1) applied to defendants who "made false statements to conceal or disguise the evasion of reporting requirements." U.S.S.G. § 2S1.3(a)(1)(B). The government tried Obiuwevbi on the theory that he lied to Personett to evade the currency reporting requirements, and the trial evidence supported that theory. Thus, § 2S1.3(a)(1) "more aptly covered" Obiuwevbi's proven conduct. The question thus becomes whether the indictment charged offense conduct covered by § 2S1.3. See U.S.S.G. § 1B1.2(a); § 2F1.1, application note 13; *Schetz v. United States*, 901 F.2d 85, 86 (7th Cir.1990). Although the superseding indictment did not in so many words charge Obiuwevbi with attempting to evade currency reporting requirements, it did charge that he made false statements "in a matter within the jurisdiction of the United States Customs Service of the United States Treasury" and that those statements involved the amount of currency he was carrying, an amount charged to be greater than $10,000. Obiuwevbi's false statements were within the Customs Service's jurisdiction because the Customs Service is responsible for enforcing the currency reporting requirements applicable to travelers leaving and entering the United States. The indictment, therefore, essentially alleged that Obiuwevbi was avoiding the currency reporting requirements by lying to Customs Service officers responsible for enforcing those requirements about the amount of cash he was carrying. The indictment was sufficient to allow the district court to apply § 2S1.3(a)(1).[2]

■ Obiuwevbi also argues that if § 2S1.3 applies, the district court should have applied § 2S1.3(a)(2) rather than § 2S1.3(a)(1). Section 2S1.3(a)(1) provides for a base offense level of 13; section 2S1.3(a)(2) provides for a base offense level

**2.** We note in passing that if Obiuwevbi had been sentenced on or after November 1, 1991, § 2S1.3 would not have applied for two reasons. First, the November 1991 amendment created a new guideline, § 2S1.4, that expressly applies to violations of 31 U.S.C. § 536, the statute that requires people taking more than $10,000 in currency out of the country to file a report. See 1991 U.S.S.G. App. C., Amendment 379. Second, after November 1991, the amended

§ 2S1.3(a)(1) would not cover Obiuwevbi's conduct in any event. The November 1991 amendment replaced the language "made false statements designed to conceal or disguise the evasion of reporting requirements" with "knowingly filed, or caused another to file, a report containing materially false statements." *Id.* Obiuwevbi did not file a report containing a false statement, so § 2S1.3(a)(1) as amended would not cover his conduct.

of 5. Obiuwevbi bases this argument on the statement in the pre-November 1991 background note to § 2S1.3(a) that the sentencing commission "anticipates that [cases in which the lower offense level applies] will involve ... minor technical violations" of the currency reporting requirements. U.S.S.G. App. C., Amdt. 379. Obiuwevbi argues that if his offense can be characterized as an attempt to violate currency reporting laws, it was just a technical violation of those laws. But § 2S1.3(a)(1)(B) expressly applied the higher offense level to false statements made to conceal the evasion of reporting requirements. Obiuwevbi cannot use the guidelines' commentary, coupled with his own characterization of his offense as "technical," to override § 2S1.3(a)(1)(B)'s express language.

For the reasons set forth above, Obiuwevbi's conviction and sentence are

AFFIRMED.