UNITED STATES of America,
Plaintiff–Appellee,

v.

Alejandro CANTERO, also known as
Alex Cantero and Salvador Arteaga–
Bernal, Defendants–Appellants.

Nos. 92–1277 & 92–1278.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 27, 1993.

Decided June 14, 1993.

Robert Michaels (argued), Office of the U.S. Atty., Crim. Div., Barry R. Elden, Asst. U.S. Attys., Criminal Receiving, Appellate Div., Chicago, IL, for U.S.

Stephen K. Larmore (argued), Skokie, IL, for Alejandro Cantero.

H. Elizabeth Kelley (argued), Oak Forest, IL, for Salvador Arteaga–Bernal.

Before COFFEY and EASTERBROOK, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

COFFEY, Circuit Judge.

On July 30, 1991, Salvador Arteaga–Bernal and Alejandro Cantero pled guilty to violating 21 U.S.C. § 846 for conspiring to knowingly and intentionally possess with intent to distribute approximately 1,595 pounds of marijuana. The district court sentenced Bernal to ninety-five months of confinement with five years supervised release to follow. Alejandro Cantero was sentenced to seventy-eight months and five years supervised release. Cantero and Bernal then filed separate notices of appeal with this court on January 21, 1992 and January 22, 1992, respectively.[1]

## I. BACKGROUND

Beginning in January 1989, Salvador Arteaga–Bernal ("Bernal") and Adam Cantero ("Adam") agreed that Bernal would deliver shipments of marijuana from his home in California to Adam in Chicago, Illinois. To accomplish their plan, Bernal purchased a delivery car that contained several hidden compartments in which the marijuana was kept during shipment and hired Harold Raab ("Raab") to drive the car.

The procedure for a typical delivery from California to Illinois was as follows: Bernal would load the marijuana into the secret compartments of the car at his home in California and then drive it across town to Raab who was to drive the car to Illinois. Before Raab would depart for Illinois, Bernal would direct him to telephone Adam in Chicago for instructions regarding what to do when he arrived with the shipment in Illinois. Raab would then drive the car to Adam's home in Chicago where Adam would unload, weigh and repackage the marijuana. Adam

---

1. Some confusion existed at oral argument as to the timeliness of Alejandro Cantero's filing of his notice of appeal. The district court announced its conviction and sentence on January 10, 1992. The notice of appeal was filed on January 22, 1992. Fed.R.App.P. 4(b) provides the notice of appeal "must be filed 'within ten days after the entry of' the order appealed from." *United States v. Kimberlin*, 898 F.2d 1262, 1267 (7th Cir.1990), *cert. denied*, 498 U.S. 969, 111 S.Ct. 434, 112 L.Ed.2d 417 (1990). Entry of the order is defined as entry on the docket. *Id.* The sentence was docketed on February 4, 1992, thus making the notice of appeal filed on January 22, 1992 timely. *See* Fed.R.App.P. 4(b) (permitting the notice of appeal to be filed before docketing of the judgment).

would in turn repack the hidden compartments in the delivery vehicle with cash as a payment for Bernal and Raab would return to California.[2] Upon returning to California, Raab would transport the car and the money to Bernal who would pay Raab $1,000 in cash for his services.

After the initial delivery in January 1989, the operation underwent a few procedural changes. First, Adam, rather than Bernal, took responsibility for paying Raab. However, it was understood that Adam was compensating Raab on Bernal's behalf. Second, during 1989, Bernal transferred title of the delivery car to Raab. And finally, in late 1990, Adam informed Raab that he would also be making deliveries to his brother's home, Alejandro Cantero ("Alejandro"), in Chicago, Illinois.

Between 1989 and 1991, ten deliveries of marijuana were made: five in 1989, two in 1990, and three within the first three months of 1991. Overall, about 1,500 pounds of marijuana were delivered: 600 pounds in 1989, 300 pounds in 1990, and 600 pounds in 1991. In each instance, Bernal loaded the delivery car and initiated contact with Raab, the courier, who in turn transported the shipment to Illinois and returned to California with Adam's payment.

In March, 1991, Bernal purchased a second delivery car in order to increase the quantity of his shipments. Bernal hired Daniel Ochs ("Ochs") as the driver of the second car. On March 18, 1991, Raab and Ochs were transporting a shipment of marijuana in the two delivery cars (traveling in tandem) when they were stopped by the Missouri Highway Patrol. They consented to the officers' search of their vehicles, who in turn discovered a total of 300 pounds of marijuana. After questioning by agents from the Drug Enforcement Agency and Missouri law enforcement officers, both Raab and Ochs agreed to cooperate with the DEA. Under the DEA's direction and supervision, Raab made two monitored phone calls to Adam in Chicago, Illinois. During the first call, Raab explained to Adam that he and Ochs were having car problems, at which time Adam told him to do his best and to stay in touch. During the second phone call, Raab informed Adam that Ochs' car would be unable to proceed and that he was going to put all the marijuana into his car. Adam agreed but instructed Raab to deliver the shipment to his home rather than the original destination, Alejandro's home. Adam notified Bernal of the problems and thereafter Bernal decided to fly to Chicago from California. After taking one of the packages of marijuana as evidence, DEA agents instructed Raab to complete the delivery.

While still being monitored by federal agents, Raab arrived at Adam's home on March 20, 1991. Raab met with Adam and Bernal who then proceeded to unload the marijuana shipment. After counting the packages, Bernal noticed that one package was missing. During unloading Raab complained about the poor condition of his delivery car and, in response, Bernal promised to buy him a new truck for future deliveries. In addition, Adam told Raab that he would give him an extra $1,000 for his trouble. Shortly thereafter, DEA agents arrested Adam and Bernal at Adam's home.

Later that same day, Alejandro was arrested outside his house and consented to a search of his car. A bag containing two handguns and $17,000 in cash was found in the trunk of Alejandro's car.[3] The $17,000 was packaged in the same manner as the money Adam had sent back with Raab on prior occasions, i.e., in bundles of 100 twenty dollar bills that were folded over and secured with rubberbands. In addition, the $17,000 was close to the $20,000 amount Raab was to receive as payment for the March shipment. Alejandro and Adam offered conflicting explanations for the large sum of money. After Alejandro's arrest, he told the agents that

2. The cash was typically packaged as rubberbanded bundles of folded over twenty dollar bills, each bundle containing one hundred bills.

3. There is dispute over whether the guns were loaded or unloaded. Alejandro contends they were unloaded while the government argues otherwise. Agent Joyce testified that the guns were loaded. O.R. 22 at 12. On the other hand, Joyce's testimony was contradicted by Agents Tucci and Zobak. Transcript Proceedings, July 15, 1991, at 44 and 77.

the $17,000 was to be used to purchase a vehicle for his brother's awning business. Adam, on the other hand, never mentioned the purchase of a new vehicle for his business. Rather, he said he was hiding the money from his wife for emergency purposes. Later, Alejandro changed his story and stated that $12,000 of the $17,000 was money Adam had given to him to keep from Adam's wife and that the remaining $5,000 was money he had saved to buy a pickup truck.

## II. ISSUES

Alejandro Cantero raises but one issue, whether the district court committed clear error in finding that he was subject to a two-level increase in his offense level under § 2D1.1(b)(1) of the Sentencing Guidelines for possessing a firearm during the commission of the offense. Bernal raises two issues: (1) whether the district court abused its discretion in declining to grant his request for an evidentiary hearing at sentencing; and (2) whether the district court committed clear error in applying the Sentencing Guidelines and finding that Bernal was a manager or supervisor of a criminal activity involving five or more participants.

## III. DISCUSSION

### A. Alejandro Cantero's Appeal

■ Alejandro appeals the district court's decision to enhance his base level offense two levels pursuant to U.S.S.G. § 2D1.1(b)(1) (enhancement for possession of a weapon) because the firearm was not in proximity to the drug offense. The district court's determination to enhance a sentence is a finding of fact which we will affirm unless it is clearly erroneous. *United States v. Ewing*, 979 F.2d 1234, 1238 (7th Cir.1992). For offenses involving drugs, section 2D1.1(b)(1) requires the sentencing court to increase the defendant's base offense level by two levels "[i]f a dangerous weapon (including a firearm) was possessed." With the two-level enhancement, Alejandro Cantero's applicable Guide-

lines range was 78–97 months, without the enhancement, the range would have been 63–78 months.

The commentary to § 2D1.1 notes:

"The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, *unless it is clearly improbable that the weapon was connected with the offense.* For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet."

U.S.S.G. § 2D1.1, comment. (n.3) (emphasis added).[4]

■ This court has previously held that § 2D1.1(b)(1) does not require the defendant to actually possess the firearm. *See, e.g., United States v. Rush*, 890 F.2d 45, 52 (7th Cir.1989). Nor is the government required to show a connection between the weapon and the offense. *United States v. Durrive*, 902 F.2d 1221, 1232 (7th Cir.1990). All the government is required to show is that the weapon was possessed during the offense. *Id.*

[4] Alejandro Cantero relies on Application Note 3, arguing it was "clearly improbable" that the firearm was connected to his drug offense. "Courts addressing the proper application of [Note 3] have generally limited its use to cases involving facts nearly identical to the hypothetical [unloaded rifle in closet]." *United States v. Garcia*, 925 F.2d 170, 173 (7th Cir.1991). For example, the Eighth Circuit applied the Note 3 "clearly improbable" exception in *United States v. North*, 900 F.2d 131 (8th Cir.1990). In *North*, the defendant operated a conspiracy to distribute drugs out of his home. When he was arrested, the officers seized an unloaded shotgun, an antique cap and ball pistol as well as an inoperable .22 rifle from his son's bedroom. The court denied the two-level firearm enhancement because (1) the cap and ball pistol was a nineteenth century model that required gun powder and lead balls making it

---

4. The Supreme Court recently announced that the Sentencing Commission's commentary to the guidelines is binding on the federal courts unless it conflicts with the Constitution or a federal statute. *Stinson v. United States*, — U.S. —, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993).

quite cumbersome to fire; (2) the shotgun was an unloaded hunting gun belonging to the defendant's son; and (3) the .22 rifle was inoperable. *Id.* at 134–35. The court concluded that "it is clearly improbable the guns were connected with the offense." *Id.* In *Ewing,* we upheld a weapons enhancement for a defendant who had a .32 caliber pistol inside a locked strongbox on his dining room table. The key to the box was in the defendant's pants pocket when he was arrested. Also inside the box was a stash of cocaine, notebooks recording drug transactions, and the defendant's wallet. We upheld the weapons enhancement despite the fact the gun was unloaded and in a locked box. *Ewing,* 979 F.2d at 1238. Likewise, this court upheld a § 2D1.1(b)(1) sentence enhancement in *Durrive* when police discovered a .357 revolver in a closet in the defendant's apartment. The court held that although the police failed to locate any drugs in the apartment, the flat had been used as the base of operations for the drug conspiracy. *Durrive,* 902 F.2d at 1230–32. The court also stated:

> "[b]ecause the facts of the case strongly suggest that the defendant possessed the handgun during the conspiracy and the defendant offered no evidence or credible argument for a finding that it was 'clearly improbable' that the weapon was connected with the offense, the district court's cursory finding that it should apply the § 2D1.1(b)(1) enhancement withstands appellate scrutiny."

*Id.* at 1231 n. 8. One clear distinction between *Ewing, Durrive* and *North* is the type of weapon involved. While the hunting guns in *North* were lethal, we have previously noted that a handgun is a "tool of the [drug] trade" because it is easy to conceal yet deadly. *United States v. Valencia,* 913 F.2d 378, 385 (7th Cir.1990). In the instant case, the two weapons found in Alejandro's trunk were both handguns. This fact in part undermines his argument that it was "clearly improbable" the guns were connected to the offense.

Nevertheless, Alejandro Cantero contends the district court erred in enhancing the sentence and argues that our decisions in *United States v. Rodriguez–Nuez,* 919 F.2d 461 (7th Cir.1990), and *United States v. Edwards,* 940 F.2d 1061 (7th Cir.1991), are controlling. In *Rodriguez–Nuez,* this court held that sufficient proximity between the firearms and the seized cocaine had not been established because the residence where the cocaine was located and the duplex where the defendant was arrested were several miles apart. This court stated there must be some proximity between the weapon and the contraband for the enhancement provision to apply. *Id.* at 467. In *Edwards,* the court was again confronted with the issue of proximity between the weapon and the crime. Edwards was convicted for delivery of cocaine twenty-five miles from his home. A search of Edward's home uncovered a number of weapons. The court applied *Rodriguez–Nuez,* and concluded that the evidence failed to establish that Edwards possessed the firearms when in close proximity to the cocaine. *Edwards,* 940 F.2d at 1064. Thus, because the weapons were twenty-five miles away from the cocaine transaction, the two-level enhancement of his sentence was denied. *Id.*

Alejandro Cantero claims that the facts of this case are virtually identical to those in *Edwards* because (1) there was no evidence Alejandro possessed the guns when in close proximity to the marijuana, and (2) the guns were inaccessible because they were locked in the trunk of his car which was fifteen miles from where the DEA seized the marijuana.

*Rodriguez–Nuez* and *Edwards,* however, are distinguishable from Alejandro Cantero's offense. Alejandro was convicted of conspiracy to possess with the intent to distribute marijuana. The defendants in *Rodriguez–Nuez* and *Edwards* were not convicted of conspiracy but of single-offense drug transactions. *Rodriguez–Nuez,* 919 F.2d at 462; *Edwards,* 940 F.2d at 1063. In *Edwards,* the court stated,

> "Mr. Edwards, like Rodriguez-Nuez, was not convicted on a conspiracy charge. Therefore, the weapons enhancement cannot be upheld under a theory that the weapons were possessed by a co-conspirator or used in furtherance of the conspiracy. *Thus, the cases in which this court*

*upheld the weapons enhancement when the defendant was convicted of conspiracy are inapplicable to the analysis in this appeal."*

*Id.* (emphasis added). In *Rodriguez–Nuez* and *Edwards* the court refused to enhance the defendants' sentences because the weapon was not in close proximity to the specific drug transaction for which the defendants were charged. In the case before us, Alejandro Cantero was charged with conspiracy to possess and distribute marijuana over a two-year interval. Thus, our review is not limited to the evidence dealing with the proximity of the gun and the drugs at the specific time of the arrest, rather, we must determine whether the gun was possessed during the offense, i.e., during the course of the conspiracy. *Durrive,* 902 F.2d at 1232. The evidence that the weapons were possessed during the offense is overwhelming.

The firearms were found in the trunk of Alejandro Cantero's automobile, located in a bag with approximately $17,000 in cash. The district court accepted the government's contention that the $17,000 was connected to the delivery of the 300 pounds of marijuana. Raab testified that he expected to receive approximately $20,000 for the marijuana delivery to give to Bernal. Additionally, on prior occasions, the cash due Bernal was folded over and rubberbanded in bundles of one-hundred $20.00 bills. The money found in Alejandro's trunk with the firearms was packaged in this same fashion.

The evidence reveals that Alejandro's home was the destination of prior marijuana deliveries and that his home was the original destination for the March 20, 1991 shipment. The destination was changed only after Raab called to advise that he was experiencing vehicle trouble in Missouri. In *United States v. Valencia,* 913 F.2d 378 (7th Cir.1990), the firearms were located in the defendant's apartment with several hundred thousand dollars. The defendant was the "money man," and although not present in his apartment when the firearms and money were found, the court concluded it was reasonable to infer the money was for a drug transaction and allowed the two-level enhancement. *Id.* at 384–385 ("It takes no great leap of logic to infer that Valencia would want to protect that money, and that the handguns in his home helped to serve that purpose.") Likewise, this court may infer that the firearms, packaged with thousands of dollars that approximated the purchase price of the marijuana, were connected to the drug transaction as drug dealers often carry weapons to protect themselves and their large amounts of drugs and cash. *See id.* As in *Valencia,* there was a sufficient nexus between the firearms and Alejandro Cantero's offense for the district court to conclude it was not "clearly improbable" that the firearms were connected to the conspiracy. Finally, after their arrest, both Alejandro and Adam Cantero were questioned regarding the $17,000. Each of their stories were inconsistent with the other as Alejandro stated that the money was to purchase a vehicle for his brother's awning business, while Adam said he was hiding the money from his wife for an emergency. Based on the evidence in the record, the district court's finding concerning the weapons enhancement was not clearly erroneous. We affirm the two-level increase in Alejandro Cantero's base offense level.

## B. Salvador Arteaga–Bernal's Appeal

The first issue Bernal raises is that the district court erred in denying his request for an evidentiary hearing to resolve a disputed sentencing issue. Section 6A1.3 of the Sentencing Guidelines provides in relevant part:

"(a) When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor....

(b) The court shall resolve disputed sentencing factors in accordance with Rule 32(a)(1), Fed.R.Crim.P. (effective Nov. 1, 1987), notify the parties of its tentative findings and provide a reasonable opportunity for the submission of oral or written objections before imposition of sentence."

We review the district court's refusal to grant an evidentiary hearing for abuse of discretion. Fed.R.Crim.P. 32(c)(3)(A) (it is within "the discretion of the court" to permit testimony on disputed facts in the Presentence Report); *United States v. Shattuck,*

961 F.2d 1012, 1014–15 (1st Cir.1992); *United States v. Garcia*, 954 F.2d 12, 19 (1st Cir.1992); *United States v. Gerante*, 891 F.2d 364, 367 (1st Cir.1989); *United States v. Monaco*, 852 F.2d 1143, 1148 (9th Cir.1988), *cert. denied*, 488 U.S. 1040, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989). An evidentiary hearing need not be afforded on demand because there is no "right" to a hearing. *Shattuck*, 961 F.2d at 1015; *Garcia*, 954 F.2d at 19. This court has held that § 6A1.3 of the Guidelines requires the district court to provide a procedure—but not necessarily an evidentiary hearing—in which the parties may argue contested sentencing issues. *United States v. Levy*, 955 F.2d 1098, 1106 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 102, 121 L.Ed.2d 62 (1992). Additionally, we have held that to satisfy the procedural requirements of § 6A1.3 it is necessary for the sentencing court to provide notice to the parties of the specific facts the court intends to rely on at sentencing. *United States v. Osborne*, 931 F.2d 1139, 1149 (7th Cir.1991).

■ Bernal argues that the court erred in denying the evidentiary hearing to determine whether he was a leader or organizer because the question was fact sensitive and he was unable to cross-examine the self-serving testimony of Raab and Ochs. Prior to sentencing, the probation department prepared a Presentence Investigation Report ("PSR") designating Bernal as an organizer or leader. Bernal was given a copy of the PSR well in advance of sentencing. The defendant and the government submitted written memoranda on the issue of whether Bernal was a leader or organizer of a criminal activity involving at least five participants. The district court agreed with the defendant that he was not an organizer or a leader subject to a four-level increase in his offense level, but the court took the position that a three-level increase accurately reflected his role as a manager or supervisor.

The defendant cites two cases, *United States v. Palta*, 880 F.2d 636 (2nd Cir.1989), and *United States v. Burch*, 873 F.2d 765 (5th Cir.1989), for the proposition that an evidentiary hearing must be conducted to settle disputed sentencing issues. In *Palta*, the court held that a defendant must receive notice and have an opportunity to be heard when contesting sentencing issues. *Palta*, 880 F.2d at 640–41. Similarly, in *Burch*, the court remanded the case for resentencing because the district court failed to adequately consider the defendant's objections to Guideline calculations. *Burch*, 873 F.2d at 766–67. In neither *Palta* nor *Burch* did the court hold that an evidentiary hearing was required to resolve factual issues. Likewise, in the case before us, we are of the opinion that an evidentiary hearing was unnecessary. Bernal received a copy of the PSR well in advance of sentencing and submitted written arguments opposing the enhancement. The district court rendered its decision only after thorough consideration of the defendant's and government's written submissions. The procedure employed by the district court complied with the requirements of Guideline § 6A1.3. *Levy*, 955 F.2d at 1106. Thus we hold that the district court did not abuse its discretion in denying the request for an evidentiary review.

■ The second issue Bernal raises on appeal is whether the district court erred in finding him a manager or supervisor of a criminal activity involving five or more participants. U.S.S.G. § 3B1.1(b). A determination that a defendant is a manager or supervisor is subject to the clearly erroneous standard of review. *United States v. Spillman*, 924 F.2d 721, 723 (7th Cir.1991). The government bears the burden of establishing by a preponderance of the evidence facts which justify upward adjustment of a defendant's offense level. *Id.* Section 3B1.1 of the U.S. Sentencing Guidelines states:

"Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved 5 or more participants or was otherwise extensive, increase by 3 levels."

*Id.* Application Note 3 permits consideration of the following factors in distinguishing be-

tween a leadership or organization role and a management or supervisory role:

"the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."

U.S.S.G. § 3B1.1, comment. (n. 3).

In the government's version of the offense, it contended Bernal was a leader or organizer and argued for a four-level enhancement. The defendant filed memoranda opposing the four-level enhancement. After reviewing the memoranda, the district court found that Bernal was a manager or supervisor but not a leader or organizer.

The district court relied on several factors in determining that Bernal was a manager or supervisor: (1) the court looked at the guilty pleas of the five defendants (Bernal, Adam and Alejandro Cantero, Raab and Ochs); (2) Raab and Ochs admitted in their pleas that they drove Bernal's vehicles from California to Chicago, Illinois, with marijuana stored in hidden compartments; (3) Bernal admitted in his plea agreement that he procured the first delivery vehicle with hidden compartments and hired Raab to transport the drugs; (4) Bernal stated that he would load the marijuana into the vehicle and deliver it to Raab in the Los Angeles, California area; (5) in 1990, Bernal transferred title of the vehicle to Raab; and (6) in 1991 Bernal secured a second vehicle and driver, Ochs, enabling him to transport more marijuana from California to Chicago.

 The district court found that the conspiracy involved five participants: Bernal, Adam and Alejandro Cantero, Raab, and Ochs. A "participant" under § 3B1.1 is "a person who is criminally responsible for the

commission of the offense, but need not be convicted." U.S.S.G. § 3B1.1, comment. (n. 1). Management or supervision of a participant occurs when a defendant exercises some control over the participant. *United States v. McGuire*, 957 F.2d 310, 316 (7th Cir.1992) (citing *United States v. Brown*, 944 F.2d 1377, 1380–82 (7th Cir.1991)). Section 3B1.1 does not require actual control over all the participants. *Id.* at 316–17. The court need only find that a defendant was a manager and the criminal activity involved five or more participants. *Id.*[5] Given the district court's extensive findings concerning Bernal's control over Raab and Ochs, we hold that the court was not clearly erroneous in determining that Bernal was a manager/supervisor. Thus, we affirm the three-level enhancement in his sentence.

## IV. CONCLUSION

The sentences of Alejandro Cantero and Salvador Arteaga–Bernal are

AFFIRMED.

---

5. Despite the overwhelming evidence of Bernal's managerial/supervisorial role, the defendant argues that he was a mere middle man in the chain of distribution and thus he was not a manager or supervisor. *Thompson*, 944 F.2d at 1349. He also argues that interdependence between he and the Canteros was lacking which negates the pos-

sibility that he was a manager or a supervisor. The district court never discussed whether Bernal was a manager over Alejandro and Adam, rather, the court found that Bernal managed Raab and Ochs. Bernal completely fails to address this finding.